[No. 49142-9.  En Banc.  June 30, 1983.]

VERA M. SMITH, *Appellant,* v. ROGER H. SHANNON, ET AL, *Respondents.*

*Hagan, Van Camp & McLendon* and *W. Russell Van Camp,* for appellant.

*MacGillivray & Jones, P.S.,* by *Dan W. Keefe,* for respondents.

UTTER, J.—This is a medical malpractice action stating two causes of action, one for negligent treatment and one for failure to obtain the plaintiff's informed consent. The trial court, sitting without a jury, found for defendants on both causes of action. The plaintiff now appeals, claiming error in two respects: (1) application of an incorrect standard in determining what risks must be disclosed to obtain a fully informed consent; and (2) failure to measure the

defendants' conduct against a standard of reasonable prudence rather than customary medical practice. We affirm, holding that the trial court did apply the proper standard governing risk disclosure and that plaintiff failed to preserve for appeal her second claim of error.

In February 1976, plaintiff, Vera Smith, contacted her attending physician, Dr. Raymond Lynberg, regarding possible kidney complications. Dr. Lynberg referred Ms. Smith to defendant Roger Shannon, a radiologist with defendant Radiology Associates of Spokane. Dr. Shannon was to administer an intravenous pyelogram (IVP) to Ms. Smith and take X–rays of her kidneys and ureters, the ducts that carry urine away from the kidneys to the bladder. An IVP is the injection of a radiopaque contrast agent, in this case, Renographin–60, into the veins of a patient. Its purpose is to enhance X–rays of the kidneys and ureters.

Prior to administering the IVP, Dr. Shannon informed Ms. Smith that her body might become flushed, that she *might become nauseous and, finally, that she might become* unconscious. Dr. Shannon apparently told Ms. Smith of no other risks. In particular, he did not inform her of 10 other risks which are mentioned in the *Physicians' Desk Reference* (PDR). The PDR is a book published by drug manufacturers which describes the uses, effects, and dangers of various drugs. One of the risks of using Renographin–60, described by the PDR, is thrombophlebitis, a type of inflammation of the vein.

After informing Ms. Smith of the risks which he did mention, Dr. Shannon began the IVP. As he did so, Ms. Smith began to sneeze and experienced a shooting pain down her arm. Apparently viewing the sneezing as insignificant and unaware of Ms. Smith's pain, Dr. Shannon completed the IVP and took the X–rays.

The pain in Ms. Smith's arm persisted and soon a dark streak appeared. A week after the IVP, she visited Dr. Lynberg, who diagnosed reactive phlebitis. Reactive phlebitis is an inflammation of the vein in reaction to some irritant. Renographin–60, the contrast agent used in the IVP,

is an irritant.

Ms. Smith's pain has continued and she has seen several physicians and been through related surgery twice. Specialists have diagnosed her pain as caused by damage to the nerves in her arm, however, and the record does not disclose whether or how this damage is related to Dr. Lynberg's initial diagnosis of phlebitis.

At trial, the court, weighing all of the evidence as trier of fact, dismissed Ms. Smith's cause of action for negligence on the ground that she had not demonstrated any deviation by Dr. Shannon from the established standard of medical practice. The court also rejected Ms. Smith's claim that Dr. Shannon had failed to obtain her informed consent, on the ground that Dr. Shannon had informed Ms. Smith of all material risks. While the court recognized that Dr. Shannon had not informed Ms. Smith of all of the risks described in the PDR, it concluded that Ms. Smith had failed to prove that any of these "were in fact medically significant or recognized risks." Clerk's Papers, at 94, 102. In so concluding, the court noted in particular that Ms. Smith had failed to produce sufficient expert testimony on this issue and indicated that it considered such testimony necessary.

## I
## A

The doctrine of informed consent refers to the requirement that a physician, before obtaining the consent of his or her patient to treatment, inform the patient of the treatment's attendant risks. The doctrine is premised on the fundamental principle that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body". *Schloendorff v. Society of N.Y. Hosp.,* 211 N.Y. 125, 129, 105 N.E. 92 (1914) (Cardozo, J.), *overruled on other grounds, Bing v. Thunig,* 2 N.Y.2d 656, 667, 143 N.E.2d 3, 163 N.Y.S.2d 3 (1957). A necessary corollary to this principle is that the individual be given sufficient information to make an *intelligent* decision. *See Canterbury v. Spence,* 464 F.2d 772, 783 (D.C.

Cir. 1972).

The seminal case on informed consent in this state is *Miller v. Kennedy,* 11 Wn. App. 272, 522 P.2d 852 (1974), *aff'd per curiam,* 85 Wn.2d 151, 152, 530 P.2d 334 (1975). This Court of Appeals opinion bears the strong stamp of approval by this court, which unanimously and unequivocally affirmed it. *See Miller v. Kennedy,* 85 Wn.2d 151, 152, 530 P.2d 334 (1975) ("[w]e can add nothing constructive to the well considered opinion of that court and, accordingly, approve and adopt the reasoning thereof").

In *Miller,* the Court of Appeals emphasized that it is for the patient to evaluate the risks of treatment and that the only role to be played by the physician is to provide the patient with information as to what those risks are.[1]

> Once it has been established by expert medical testimony that a risk existed, then the existence of the risk is the patient's business; and it is not for the medical profession to establish a criteria [*sic*] for the dissemination of information to the patient based upon what doctors feel the patient should be told.

*Miller,* at 285–86.[2] To allow physicians, rather than patients, to determine what information should be disclosed would be in direct conflict with the underlying principle of patient sovereignty. *Canterbury v. Spence, supra* at 784.

■ On its face, this seems to imply that every risk, no matter how minute, must be disclosed. Such an interpretation goes too far, however. As one pair of commentators has noted, a physician "need not disclose every risk which *could* be disclosed, if only because of the time required to disclose every remote risk." Waltz & Scheuneman, *Informed Consent to Therapy,* 64 Nw. U. L. Rev. 628, 635 (1970). The

---

[1]Certain special circumstances, none of which are pertinent here, may justify nondisclosure, however. *See Holt v. Nelson,* 11 Wn. App. 230, 241–42, 523 P.2d 211 (1974).

[2]All references and citations to *Miller* hereafter will be to the Court of Appeals opinion.

informed consent doctrine "does not place upon the physician a duty to elucidate upon all of the possible risks, but only those of a serious nature." *ZeBarth v. Swedish Hosp. Med. Ctr.,* 81 Wn.2d 12, 25, 499 P.2d 1 (1972). *See also Gates v. Jensen,* 92 Wn.2d 246, 251, 595 P.2d 919 (1979) ("high risk"); *Meeks v. Marx,* 15 Wn. App. 571, 578, 550 P.2d 1158 (1976) ("grave risks"); *Miller,* at 293 (quoting American Hosp. Ass'n, *Statement of a Patient's Bill of Rights* (1972)) ("medically significant risks"); *Mason v. Ellsworth,* 3 Wn. App. 298, 313, 474 P.2d 909 (1970) ("physician [does not] ha[ve] an obligation to detail *all* risks of a given procedure" but only "reasonably foreseeable" risks). The guide for disclosure is materiality. *Miller,* at 287. The test of materiality is an objective one incorporating the underlying concept of patient sovereignty.

The patient is endowed with the right to know each hazard which the usual person would utilize in reaching his decision. When a reasonable person in the patient's position probably would attach significance to the specific risk in deciding on treatment, the risk is material and must be disclosed.

*Miller,* at 287.

In the present case, therefore, liability cannot per se be predicated on Dr. Shannon's failure to inform Ms. Smith of all of the risks described in the PDR. The trial court properly moved on to consider whether any of the undisclosed risks were material. Ms. Smith apparently concedes the propriety of this analysis, but claims that the trial court applied an erroneous test of materiality.

## B

■ One important practical issue in informed consent cases is whether expert testimony is necessary to show materiality. Problems inherent in requiring such testimony include lack of a uniform community standard, relegation of the patient's rights to secondary importance, and the oft–described "conspiracy of silence". *Mason v. Ellsworth, supra* at 308–09; *Wilkinson v. Vesey,* 110 R.I. 606, 623–24, 295 A.2d 676 (1972); Comment, *A New Standard for*

*Informed Consent in Medical Malpractice Cases—The Role of the Expert Witness,* 18 St. Louis U. L.J. 256, 260–63 (1973). On the other hand, expert testimony is generally of great assistance, and very often necessary, in enabling a lay trier of fact to make a reasoned decision. 51 Wash. L. Rev. 167, 177 (1975).

We have concededly shifted to an extent on the issue of an expert testimony requirement. In *ZeBarth v. Swedish Hosp. Med. Ctr., supra,* we noted that "in most instances, and as a general rule, the duty to inform the patient must be established by expert medical testimony or reasonable inferences to be drawn from it." *ZeBarth,* at 24. In *ZeBarth,* however, we enunciated a test for materiality based on the standard of disclosure in the medical profession. *See ZeBarth,* at 26–27. That test has since been replaced by the "reasonable patient" test enunciated in *Miller* and set out above, as we recognized in *Keogan v. Holy Family Hosp.,* 95 Wn.2d 306, 318, 622 P.2d 1246 (1980). Where the focus of the materiality test is on the patient rather than the profession, expert testimony is of secondary importance.

> The jury is capable of deciding whether the doctor did not tell the patient about something that should have been revealed. The jury does not need testimony from physicians about the norm of disclosure in the community. The usual conduct of doctors in this matter is not relevant to the establishment of the liability which is imposed by law. The jury, as lay people, are equipped to place themselves in the position of a patient and decide whether, under the circumstances, the patient should have been told.

*Miller,* at 288–89. *See also Keogan,* at 318.

*Miller* does not completely obviate the need to present expert testimony, however. While the court generally stated that "[t]he testimony of medical experts is not necessary to establish the duty to disclose" (*Miller,* at 285), its reasoning indicates that it was simply applying general rules regarding expert testimony. A trier of fact does not require expert testimony to determine whether a reasonable patient would

consider a given risk material. On the other hand, expert testimony is necessary, for example, to establish the existence of a risk, and this was expressly recognized in *Miller,* at 285, 288 n.10. The *Miller* analysis of expert testimony requirements in informed consent cases is simply a particular application of the general rule that expert medical testimony is *required* on only those matters "strictly involving medical science". 2 J. Wigmore, *Evidence* § 568, at 779 (rev. 1979). The basic question is whether the particular fact sought to be proved is such as is "observable by [a layperson's] senses and describable without medical training". *Bennett v. Department of Labor & Indus.,* 95 Wn.2d 531, 533, 627 P.2d 104 (1981). Whether a reasonable patient would want to know of a given risk is such a fact; however, the existence, magnitude, and other scientific characteristics of the risk are not.

Understood in this context, *Miller*'s seemingly absolute language must be qualified somewhat. The determination of materiality is a 2-step process. Initially, the scientific nature of the risk must be ascertained, *i.e.,* the nature of the harm which may result and the probability of its occurrence. *See Canterbury v. Spence, supra* at 787–88; Waltz & Scheuneman, at 641; Comment, *Informed Consent in Medical Malpractice,* 55 Calif. L. Rev. 1396, 1407 n.68 (1967). The trier of fact must then decide whether that probability of that type of harm is a risk which a reasonable patient would consider in deciding on treatment.

While the second step of this determination of materiality clearly does not require expert testimony, the first step almost as clearly does. King, *The Standard of Care and Informed Consent Under the Tennessee Medical Malpractice Act,* 44 Tenn. L. Rev. 225, 288 (1977). Only a physician (or other qualified expert) is capable of judging what risks exist and their likelihood of occurrence. The central reason for requiring physicians to disclose risks to their patients is that patients are unable to recognize the risks by themselves. Just as patients require disclosure of risks by their physicians to give an informed consent, a trier of fact

requires description of risks by an expert to make an informed decision.

Some expert testimony is thus necessary to prove materiality. Specifically, expert testimony is necessary to prove the existence of a risk, its likelihood of occurrence, and the type of harm in question. Once those facts are shown, expert testimony is unnecessary.

## C

Ms. Smith contends that the trial court in the present case failed to properly apply the standards described above. Her central contention is that the trial court improperly based its rejection of her informed consent claim on her failure to produce sufficient expert testimony. She also claims that the court erroneously defined materiality in terms of the risks customarily disclosed by other physicians.

Regarding the need for expert testimony, Ms. Smith was required to present some expert testimony to show the magnitude and other scientific characteristics of the risks described in the PDR. No further expert testimony was necessary, however.

The trial court did indicate in its memorandum opinion that the basis for its rejection of Ms. Smith's informed consent claim was insufficient expert testimony.

> [T]he elements of the doctrine which are in the province of the medical profession must be established by testimony of medical experts. In other words, expert medical testimony is required to establish that in fact a material risk exists before the question of whether there is a duty to disclose is raised. Plaintiff has failed to produce this necessary evidence. She has not established by expert testimony that any of the 10 items on the list were in fact medically significant or recognized risks. She has failed to show that there was a duty imposed upon defendant to make any disclosures to her other than those made.

Clerk's Papers, at 93–94. The court's reference to "medically significant or recognized risks" appears to refer to the likelihood of occurrence, proof of which does require expert

testimony. Yet the general tenor of its reasoning is concededly somewhat vague.

The judgment of a trial court is presumed to be correct, however. *Mattice v. Dunden,* 193 Wash. 447, 450, 75 P.2d 1014 (1938). In particular, "when the language of findings is equivocal and susceptible of . . . another construction, the findings will be given that meaning which sustains the judgment, rather than one which would defeat it." *Shockley v. Travelers Ins. Co.,* 17 Wn.2d 736, 743, 137 P.2d 117 (1943). *See, e.g., Redmond v. Kezner,* 10 Wn. App. 332, 343, 517 P.2d 625 (1973) (construing "material" as used in findings of fact differently than as used in law governing anticipatory repudiation). Especially in light of this presumption, we are convinced that the trial court properly applied expert testimony requirements.

Ms. Smith also points to other language in the trial court's memorandum opinion, claiming that it defined materiality as the standard of disclosure in the medical profession rather than as a function of the needs of a reasonable patient. The trial court did note that a number of physicians testified that informing a patient of the risk of phlebitis resulting from an IVP was not customary practice in 1976. Nowhere, however, is there any indication that the trial court viewed this testimony as dispositive rather than merely considered it as some evidence. *Miller* expressly recognizes that customary practice may be considered as evidence. *Miller,* at 288 n.10. This claim of error must thus be rejected as well.

D

While Ms. Smith does not expressly challenge the sufficiency of the evidence, a review of it is appropriate to assure that we have correctly interpreted the trial court's application of the law. In undertaking such review, however, it must be recalled that our review is limited to the determination of whether the findings are supported by substantial evidence. *Brown v. Safeway Stores, Inc.,* 94 Wn.2d 359, 372–73, 617 P.2d 704 (1980). Evidence is sub-

stantial if it is sufficient to persuade a fair–minded person. *Brown*, at 373.

In the instant case, there was sufficient evidence to support the trial court's findings. Of the five witnesses who testified about the likelihood of occurrence of the undisclosed risks, four characterized their occurrence as "remote", "very rare", or "occasional". The fifth simply concluded that the undisclosed risks were not "material". The only statistical evidence presented regarding the undisclosed risks was (1) that the chance of death was about 8.6 in 1 million and (2) that one study showed an occurrence of phlebitis in only .05 percent of over 21,000 cases. These small probabilities compare quite favorably with those in other cases where nondisclosure has been held justified. *See, e.g., Stottlemire v. Cawood*, 213 F. Supp. 897 (D.D.C. 1963) (1/800,000 chance of aplastic anemia); *Yeates v. Harms*, 193 Kan. 320, 393 P.2d 982 (1964) (1.5 percent chance of loss of eye); *Starnes v. Taylor*, 272 N.C. 386, 158 S.E.2d 339 (1968) (1/250 to 1/500 chance of perforation of esophagus); *cf. Bowers v. Talmage*, 159 So. 2d 888 (Fla. Dist. Ct. App. 1963) (3 percent chance of death, paralysis or other injury required disclosure); *Scott v. Wilson*, 396 S.W.2d 532 (Tex. Civ. App. 1965), *aff'd*, 412 S.W.2d 299 (Tex. 1967) (1 percent chance of loss of hearing required disclosure). Moreover, no evidence at all was presented of the dangers which phlebitis presents, other than Dr. Shannon's testimony that "ordinarily it is a self–limited problem with no further difficulty."[3] Verbatim Report of Proceedings, at 32. Finally, there was uncontradicted testimony that a patient who had had a prior uneventful IVP, as had

---

[3]While some types of harm, such as death, can be evaluated by the trier of fact without the aid of expert testimony, others, such as phlebitis, will require expert explanation. The need for such testimony will turn on whether the direct harm or the indirect harms which follow from it are the major concern. In the case of death, death itself is the major injury. In the case of phlebitis, it is not the phlebitis itself which is of concern, but the complications and further dangers to which it may give rise. The connection between phlebitis and these indirect harms must be established by expert testimony.

Ms. Smith, was even less likely to develop complications than others.

While two witnesses did at some point generally testify that the undisclosed risks were "material" or "significant", the same witnesses testified at other times that the risks were not "material" and expressed confusion about what "material" meant. Keeping in mind that it is not the province of this court to reweigh the evidence as presented by a sterile and lifeless record (*Davis v. Department of Labor & Indus.*, 94 Wn.2d 119, 124, 615 P.2d 1279 (1980)), we cannot say that the evidence was insufficient to support the trial court's findings.

## II

The second assignment of error made by Ms. Smith is that the trial court erred in measuring Dr. Shannon's performance of the IVP against the established standard of medical practice rather than a standard of reasonable prudence. At no time, however, did she suggest to the trial court that the latter standard was the one which it should apply.

Failure to raise an issue before the trial court generally precludes a party from raising it on appeal. *Seattle–First Nat'l Bank v. Shoreline Concrete Co.*, 91 Wn.2d 230, 240, 588 P.2d 1308 (1978); RAP 2.5(a). For example, a party must except to erroneous jury instructions in order to preserve the error for review. *Estate of Ryder v. Kelly–Springfield Tire Co.*, 91 Wn.2d 111, 114, 587 P.2d 160 (1978). The reason for this rule is to afford the trial court an opportunity to correct any error, thereby avoiding unnecessary appeals and retrials. *Estate of Ryder,* at 114.

The same rationale requires parties to inform a court acting as trier of fact of the rules of law they wish the court to apply. While a party has the right to assume that the trial court knows and will properly apply the law, this does not excuse failure to seek correction of an error once the complaining party becomes aware of it. If by no other means, this can be done by a motion for a new trial. *State*

*v. Wicke,* 91 Wn.2d 638, 642, 591 P.2d 452 (1979). Failure to make such a motion when it would enable the trial court to correct its error precludes raising the error on appeal, unless the error was pointed out at some other point during the proceedings. *Wicke,* at 642–43; *Balandzich v. Demeroto,* 10 Wn. App. 718, 726, 519 P.2d 994 (1974). *See also* CR 46 (party must make known action which he or she desires court to take).

Since the present case was tried without a jury, a motion for a new trial would have permitted the trial court to correct any error. Ms. Smith's failure to make any such motion, or at any other time suggest application of a reasonable prudence standard, prevents her from raising it here. While she correctly points out that we may nonetheless address the issue if we choose (*see Maynard Inv. Co. v. McCann,* 77 Wn.2d 616, 623, 465 P.2d 657 (1970)), we are not bound to do so and usually refuse. *See Powers v. Hastings,* 93 Wn.2d 709, 712–13, 612 P.2d 371 (1980). For several reasons, we choose not to exercise our discretion here. First, the equities in this case weigh against Ms. Smith, for she expressly argued a customary practice standard of care below in her memorandum in opposition to defendants' motion for summary judgment. Second, the standard of care is now governed by a statute which became effective in mid–1976. *See* RCW 7.70.040. Deciding the question Ms. Smith raises would therefore be of little precedential value for future cases. *Cf. Sorenson v. Bellingham,* 80 Wn.2d 547, 558, 496 P.2d 512 (1972) (one factor entering into court's decision to decide moot issue is need to provide future guidance to public officers).

The decision of the trial court is affirmed.

WILLIAMS, C.J., and ROSELLINI, STAFFORD, BRACHTENBACH, DOLLIVER, DORE, DIMMICK, and PEARSON, JJ., concur.

Reconsideration denied August 24, 1983.