[No. 37313-1-II.    Division Two.    February 2, 2010.]

TAE T. CHOI ET AL., *as Representatives of New Hope Christian Reformed Church of Tacoma, Respondents*, v. SAMUEL Y. SUNG ET AL., *Appellants*.

304

*Justin D. Bristol*, for appellants.

*Carl J. Marquardt* (of *Law Office Of Carl J. Marquardt*), for respondents.

¶1 Penoyar, J. — In this case, we review the trial court's resolution of a dispute involving church property in

Tacoma. The trial court ordered Reverend Samuel Sung, Young Hee Sung, and Morning Star World Mission to transfer the disputed property to New Hope Christian Reformed Church of Tacoma, and to pay any revenues generated from the property during their wrongful ownership to the church. Applying the "deference approach" discussed in *Presbytery of Seattle, Inc. v. Rohrbaugh*, 79 Wn.2d 367, 485 P.2d 615 (1971), and *Southside Tabernacle v. Pentecostal Church of God, Pac. Nw. Dist., Inc.*, 32 Wn. App. 814, 650 P.2d 231 (1982), with regard to church property disputes, we affirm the trial court's order.

## FACTS

### I. HISTORY OF NEW HOPE CHRISTIAN REFORMED CHURCH

¶2 Samuel Sung became a minister in the Christian Reformed Church of North America (CRCNA) in 1985. He founded the Hope Christian Reformed Church (Hope CRC) in Seattle around the same time. In 1991, Hope CRC became an officially recognized member of the CRCNA and the Classis Pacific Northwest, a regional association of CRCNA churches in Western Washington and Alaska. Sung served as pastor to Hope CRC, and its successor New Hope Christian Reformed Church (New Hope CRC), from its inception until his retirement in 2003.

¶3 Originally, Hope CRC owned property in SeaTac. In 1999, it sold that property and purchased property in Tacoma, which is the property in dispute here. When Hope CRC moved to Tacoma, it changed its name to New Hope CRC.[1]

¶4 Sung originally incorporated "Hope Christian Reformed Church," Unified Business Identifier (UBI) No. 23-705-023 in 1986. Clerk's Papers (CP) at 134. The State administratively dissolved the corporation in 1994 for failure to file its annual list of officers. Sung seldom maintained the church's corporate status or kept corporate

---

[1] When Hope CRC moved to Tacoma, it had only 10 members.

minutes or records. In 1997, Sung formed a second entity, "Hope Christian Reformed Church of Seattle," UBI No. 601-811-132, apparently to reinstate the original Hope CRC. CP at 134. In 1999, the second Hope CRC entity changed its name to "New Hope Christian Reformed Church," but in 2000 it too was dissolved. CP at 134.

¶5 The CRCNA has many rules and requirements for its member churches, which are set forth in the "Church Order and Rules for Synodical Procedure" (Church Order). Ex. 45. The Church Order generally requires governance by a church council composed of a senior pastor, church elders, and church deacons. Sung did not always abide by CRCNA rules.[2] For example, as pastor, Sung made decisions without the church council's participation.

¶6 As Sung neared retirement, he began to seek someone to replace him. Sung chose not to follow CRCNA procedure for this process. Instead, Sung found someone whom he thought was a suitable candidate, Reverend B. Kim, a minister in the Presbyterian Church (PCUSA).[3] Sung and Kim entered into an agreement that would merge their two churches and allow Kim to become minister of the New Hope CRC.[4] At the time of the merger, Sung's congregation had dwindled to 15 members, consisting of Sung's family and two or three other families. Kim's congregation had approximately 40-50 members.

---

[2] When Hope CRC joined the CRCNA in 1991, Sung signed a "Form of Subscription," stating that he would follow the CRCNA "church order." Ex. 102, at 34, 35. During deposition, however, Sung argued that although he signed the form, he had agreed to follow the "church order" only "in part." Ex. 102, at 35. There is nothing indicating that Sung's agreement with the CRCNA was different from any other form of subscription.

[3] Although the PCUSA is a different denomination from the CRCNA, the record demonstrates that Presbyterian and Christian Reformed Churches share common historical roots and are fairly similar in terms of doctrine and governance. At times, Sung claimed that New Hope CRC ceased to associate with the CRCNA between 2003 and 2004 because certain literature referred to the church as "New Hope Presbyterian Church." The CRCNA disputes this by providing evidence that many of its local congregations use the term "Presbyterian" in their church names with its full blessing. Ex. 76, at 2.

[4] Sung did not have approval from his congregation to enter into this agreement.

¶7 In October 2002, Sung drafted and executed the agreement, which he wrote in Korean. At trial, translators disagreed about the precise meaning, but in essence the agreement provided that:

a.  Reverend B. Kim was to take over as Senior Pastor of the New Hope [CRC];

b.  Reverend B. Kim was to become [an officially sanctioned] CRCNA pastor;

c.  Reverend Sung was to be paid $60,000 [in cash] and the new congregation was to assume $40,000 in debt;[5]

d.  There was to be a retirement ceremony for Sung.

CP at 135. Neither the Classis nor the CRCNA was informed of this agreement.

¶8 Kim's congregation raised $60,000 and paid it to Sung. Sung officially retired in April 2003. Sung's CRCNA status changed from senior pastor to "Pastor Emeritus," which was required for him to access his CRCNA pension. CP at 135-36.

¶9 Following the merger, new church council members were elected, including Tae Choi, InMin Kim,[6] and Myung Soon Hilton. InMin Kim and Hilton joined New Hope CRC in 2002 as members of Kim's congregation. Choi, who had known Kim for some time, joined New Hope CRC in September 2003 and became a church elder. Kim served as pastor for the New Hope CRC congregation for nearly two years. He started the process of becoming a CRCNA certified pastor, but he did not complete the program. Nonetheless, the CRCNA considered New Hope CRC to be affiliated with them during this period.

¶10 After two years, Kim left New Hope CRC, leaving the church without a senior pastor. The church invited various pastors from other denominations to conduct weekly services while New Hope CRC decided what to do.

---

[5] This debt included a $25,000 mortgage on the Tacoma property and a $15,000 debt to the Classis.

[6] To avoid confusion, plaintiff and church council member "InMin Kim" is always referred to by this name.

¶11 Sung, who still attended New Hope CRC on a sporadic basis, came back and announced to the church that he would reclaim his position as senior pastor.[7] The church council rejected Sung's offer and asked the Korean Council[8] and the Classis to call for a new pastor in accordance with CRCNA rules. Sung promptly told those who had joined New Hope CRC during the merger with Kim's congregation that they were no longer members of the New Hope CRC congregation.[9] Sung informed them that they could no longer hold services at the Tacoma property, and he changed the locks on the building.

¶12 In the meantime, Sung set up a new entity called "New Hope Christian Reformed Church," UBI No. 602-450--843, and a second entity called "Morning Star World Mission," UBI No. 602-468-976.[10] Though the record reveals no evidence of elections of council members or formal approval by an elected church council, Sung executed a quitclaim deed to transfer the Tacoma property from New Hope CRC to Morning Star World Mission.[11] Sung claims that a

---

[7] At his deposition, Sung maintained that he was still the president of the church council after retirement. Counsel asked Sung to clarify how this was the case. Sung responded that because Kim was not formally installed as a CRCNA pastor, "he could not manage [ ] church matters. So that means that up until such time as the new pastor got installed the existing pastor ha[s] the right to operate the church." Ex. 102, at 49. There appears to be no basis for this proposition in the CRCNA's rules. Further, when asked if the postmerger congregation voted him onto the council, Sung's responses were evasive, and he eventually stated, "No." Ex. 102, at 50.

[8] The Korean Council is a council of ministers and elders of Korean CRCNA churches within the Northwest Classis.

[9] The ousted congregation included the church council and almost all existing members of the church, excluding Sung's family. In a letter to the congregation, Sung wrote, "[A]ll member[s] who have joined the New Hope CRC congregation who used to be Rev. Kim's old church, automatically [lose] their rights or claims, whatsoever, on the polity of the church nor [sic] utilization of the church resources and properties." Ex. 26.

[10] For the new New Hope entity, the articles of incorporation list only Sung and Jennifer Yang as directors. Further, for the new Morning Star entity, Sung listed himself as the only director in the articles of incorporation.

[11] The transfer occurred on April 7, 2005. Morning Star has rented the property to another church for $1,500 a month. Pl.'s Ex. 89. As of October 2, 2007, Morning Star had received $27,500 in payments for use of the Tacoma church space. A large

unanimous "vote of the members of his original New Hope CRC congregation and leadership" authorized his actions. Appellant's Br. at 13. However, Sung did not invite Choi or InMin Kim to the meeting to discuss the quitclaim deed or invite them to vote on the matter.

¶13 While seeking help from the CRCNA, the ousted congregation began holding services at various homes, eventually renting a room in the basement of another church for $300 a month. The congregation had a new CRCNA minister, Reverend G. Kim, appointed to serve as pastor on an interim basis.

II. DISPUTE AT THE CLASSIS

¶14 To be affiliated with the CRCNA, a church must agree to certain rules in the "Church Order and Rules for Synodical Procedure." Ex. 45. One rule requires the Classis or Synod (the assembly above the Classis) to resolve disputes concerning ecclesiastical[12] matters. The churches must agree that the Classis or Synod rulings are binding on them, unless those rulings "conflict with the Word of God." Ex. 45, at 14.

¶15 The Classis, following church policy and rules of governance, directed the Classis Interim Committee (CIC) to investigate the dispute between Sung and the ousted congregation. After an investigation, the CIC made the following recommendations to the Classis in March 2005:

1. That Rev. Sung resume the honorable position of Pastor Emeritus and not be recognized as the Senior Pastor of the New Hope CRC and not be considered a member of its Council.

2. That Classis recognize Elder Tae Young Choi as a legitimate elder in the New Hope CRC.

3. That Classis note that the group with Elder Choi (which has been locked out of the building) is sincere in its desire to be a member congregation in the CRC.

portion of this money goes to Sung in various ways, including mission trips for Morning Star and attorney fees.

[12] "Ecclesiastical" means "of or relating to a church esp. as a formal and established institution." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 718 (2002).

4.  That Classis recognize the right of the congregation to begin the process of calling a new Senior Pastor (to be done under the guidance of the Korean Council).

5.  That Classis, by these actions, declare that the congregation under the leadership of its Council has the right to the church building and its contents and the Rev. Sung be requested to turn the keys of the building over to the Council.

6.  That Classis urge all those involved seek to be reconciled to one another and live in harmony with one another as the Word of God instructs so that the name of our Lord Jesus may be lifted up and not shamed. We as a Classis offer our services toward this end, and particularly stand ready to form a pastoral team to seek reconciliation and pastoral care. This team would be formed under the guidance of the Classical Interim Committee, and include elements of the Korean Counsil [sic].

Ex. 49, at 5. Although the Classis adopted all six recommendations, it did not attempt to implement them immediately. Instead, it called in a mediator from Los Angeles, Reverend Tong Park, to attempt to reach an amicable solution to the dispute. This mediation proved unsuccessful, however, as Sung refused to submit to the recommendations of the Classis. On April 18, 2005, the Classis stated its intention to implement its recommendations.[13]

¶16  In the meantime, Sung had transferred the property to Morning Star on April 7, 2005. The Classis demanded that Sung void the legal documents and relinquish control of the Tacoma property, but Sung refused. In August 2005, the Classis provisionally deposed Sung and divested him of his title as a minister of the CRCNA.

¶17  Days later however, Sung wrote the Classis a letter indicating his intent to reconcile with the ousted congregation and to follow the Classis's six recommendations.[14]

---

[13] Sung had an opportunity to appeal the decisions of the Classis to the Synod, but he did not do so.

[14] Part of the letter reads:

Last Sunday, I announced before the congregation of the New Hope [CRC] of Tacoma, my apologies for causing division and strife in the body of Christ, and

Sung did not follow through on that promise and later claimed to have executed the letter under duress.

¶18 Meanwhile, in June 2005, after the Classis's ruling, Elder Choi reinstated the original New Hope CRC entity (UBI No. 601-811-132), which had been dissolved in 2000. Choi successfully reinstated this entity under the new name "New Hope Christian Reformed Church of Tacoma," identifying Choi, InMin Kim, and Hilton as directors. CP at 137. This entity had purchased the Tacoma church property before it was dissolved in 2000. Since reinstatement, it has adopted new articles and bylaws consistent with CRCNA rules.

III. THE LAWSUIT

¶19 The ousted congregation, along with the Classis, sued Sung to enforce the Classis's April 2005 decision to implement its recommendations. On April 26, 2006, the plaintiffs filed a lis pendens in Pierce County Superior Court. Sung answered the complaint and pleaded numerous counterclaims, including slander of title for the lis pendens filing. The matter was tried to the bench over 10 days in November 2007. The trial court heard testimony from Sung, Choi, InMin Kim, and several other ministers and witnesses, and the court examined over 100 exhibits.

¶20 The trial court issued a letter ruling on January 3, 2008. On March 31, 2008, the trial court entered formal findings of fact and conclusions of law. The formal findings and conclusions derive from the January letter ruling. The trial court found that the ousted congregation's corporate entity, the New Hope Christian Reformed Church of Tacoma, was the "rightful owner" of the Tacoma property,

---

announced my intention to fully follow the six recommendations set by March 3, 2005 Classis meeting, including handing over full property rights to the New Hope [CRC] of Tacoma under the jurisdiction of its rightful board of directors as specified by the church order of the [CRC]. I already handed over the church keys and exchanged the words of reconciliation with Elder Choi.

Ex. 30.

and the court ordered Sung to convey the property back to the New Hope Christian Reformed Church of Tacoma. CP at 140.[15]

¶21 Sung now appeals.

## ANALYSIS

### I. STANDARD OF REVIEW

¶22 When a trial court has weighed the evidence in a bench trial, we limit our review to whether substantial evidence supports its factual findings and, if so, whether those findings support the trial court's conclusions of law. *Hegwine v. Longview Fibre Co.*, 132 Wn. App. 546, 555, 132 P.3d 789 (2006). Substantial evidence exists when there is a sufficient quantity of evidence to persuade a fair-minded, rational person that a finding is true. *In re Estate of Jones*, 152 Wn.2d 1, 8, 93 P.3d 147 (2004). We review only those findings to which appellants assign error; unchallenged findings are verities on appeal. *Hegwine*, 132 Wn. App. at 556. On appeal, we view the evidence in the light most favorable to the prevailing party and defer to the trial court regarding witness credibility and conflicting testimony. *Weyerhaeuser v. Tacoma-Pierce Cnty. Health Dep't*, 123 Wn. App. 59, 65, 96 P.3d 460 (2004). We review de novo questions of law and conclusions of law. *Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 880, 73 P.3d 369 (2003). Further, we review de novo conclusions of law erroneously labeled as findings of fact. *Hegwine*, 132 Wn. App. at 556.

### II. WATSON COMPULSORY DEFERENCE RULE

¶23 In reviewing church disputes, courts must take care not to violate the First Amendment prohibition against

---

[15] The trial court also (1) ordered the defendants to pay "all rent and other payments" relating to the use of the property to New Hope Christian Reformed Church of Tacoma pending reconveyance of the property; (2) ordered Morning Star to pay the $27,500 in revenues generated from the property through September 10, 2007, and to pay an additional $1,500 per month from September 10, 2007 through the date of judgment; and (3) dismissed the defendants' counterclaims with prejudice. CP at 142.

a state entangling itself in matters of church doctrine and practice. The Supreme Court warned against this tendency in *Presbyterian Church in United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*:

> [T]he First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. . . . But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern . . . . [T]he Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine.

393 U.S. 440, 449, 89 S. Ct. 601, 21 L. Ed. 2d 658 (1969).

■ ¶24 Historically, the United States Supreme Court has recognized three methods for resolving church property disputes. It is unnecessary to discuss all three, as Washington State has adopted the approach discussed in *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 20 L. Ed. 666 (1871), commonly known as the *"Watson* compulsory deference rule." *Southside Tabernacle*, 32 Wn. App. at 820 n.2. Using the *Watson* rule, we must decide "whether or not the local church is subject to some higher governing authority." *Southside Tabernacle*, 32 Wn. App. at 818. If the local church is subject to some higher governing authority, then the church structure is described as "hierarchical." *Southside Tabernacle*, 32 Wn. App. at 818. More specifically, a "hierarchical church" is defined as a "general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete, in some supreme judicatory over the whole

membership of that general organization." *Watson*, 80 U.S. at 722-23.

¶25 The second church organizational structure that *Watson* identified is a "congregational" structure. A "congregational structure" is defined as "a religious congregation which, by the nature of its organization, is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority." *Watson*, 80 U.S. at 722. As noted in *Southside Tabernacle*, "[m]ost large [P]rotestant denominations and the Roman Catholic Church have been found to be hierarchical," while courts treat most Baptist churches as congregational. 32 Wn. App. at 818-19.

¶26 Whether a church is congregational or hierarchical is important because it mandates what type of analysis a trial court will undertake when reviewing the church dispute. Where there is a determination that the church fits the congregational model, the trial court should enforce the property decisions made "either by a majority of its members or by such other local organism as it may have instituted for the purpose of ecclesiastical government." *Watson*, 80 U.S. at 724. The approach taken toward a hierarchically structured church is different. In a hierarchical setting, civil courts defer to the decision rendered by the highest church judicatory to which the question/dispute was presented.[16] *Watson*, 80 U.S. at 727.

¶27 Here, the trial court's finding of fact determining whether New Hope CRC was hierarchical or congregational is somewhat equivocal. The finding states that "[t]here was testimony that [the church] is a blend, and that is probably true, but [the church] is clearly more congregational." CP at

---

[16] Courts in other jurisdictions have approved of other approaches to property disputes in a hierarchical setting. *See Jones v. Wolf*, 443 U.S. 595, 603, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979) (approving Georgia's application of the "neutral principles of law" approach and determining that the First Amendment does not specifically dictate that a State follow a particular method of resolving church property disputes). The Washington Supreme Court has disavowed the approach taken in *Jones v. Wolf* and exclusively adopted the deference approach. *Presbytery of Seattle, Inc.*, 79 Wn.2d at 373.

138. What follows that statement is an explanation by the trial court that the congregation had to follow "certain rules or concepts" in order to affiliate with the CRCNA. CP at 138. The trial court continues by pointing out that the "congregation, church council, elders, deacons and pastor of New Hope CRC were bound to follow the rulings of the Classis" on ecclesiastical matters. CP at 138. Essentially, the trial court labels New Hope CRC as "congregational" but then immediately describes several characteristics of New Hope CRC that are more in keeping with "hierarchical" churches.[17]

¶28 The trial court's conclusions of law, however, are unequivocal: they treat the church dispute as if the church is hierarchical. The trial court's conclusions of law explain that because deference is owed to the Classis on ecclesiastical matters, the church is obligated to accept its rulings on matters of "who is in the congregation of the New Hope CRC,[18] and what authority Sung had as a Pastor Emeritus," thus deciding the issue of who has the right to the property's title. CP at 139. The trial court continues, "The Court must defer to the rulings of the church on ecclesiastical matters, which include church governance. As noted, affiliated churches have to follow these same rules of governance." CP at 139.

¶29 Sung urges us to consider the trial court's "congregational" finding in isolation while ignoring the important explanation and analysis that follow. Sung asks us to "agree" with the trial court, find New Hope CRC to be congregational, and remand this matter for analysis under "neutral principals of law." Appellant's Br. at 3.

■ ¶30 We decline to do so. Where findings are equivocal, we interpret them in a manner that " 'sustains the judgment, rather than [in a manner] which would defeat

---

[17] The trial court did not make an oral ruling: "I'm not going to, obviously, give you a decision from the bench after a 10-day trial and 100-and-some-plus exhibits . . . ." Report of Proceedings (Nov. 30, 2007) at 1253.

[18] Sung agreed with this in his deposition, stating that the Classis decides who may become a CRCNA member.

it.'" *Smith v. Shannon*, 100 Wn.2d 26, 35, 666 P.2d 351 (1983) (quoting *Shockley v. Travelers Ins. Co.*, 17 Wn.2d 736, 743, 137 P.2d 117 (1943)). In context, the trial court's description of the church as "clearly more congregational" pertains to the way New Hope CRC conducted itself over the years. CP at 138. The language that follows clarifies the court's findings that New Hope CRC was bound by the rules of the CRCNA, a hierarchical church organization. The trial court's word choice was inartful,[19] but its intent was clear: New Hope CRC is hierarchical and thus, the Classis's decisions on matters presented to it are properly accorded deference. Because substantial evidence supports the finding that New Hope is hierarchical, we affirm the trial court's decision that the parties are bound by the Classis's decisions and that the rightful owner of the Tacoma property is the New Hope Christian Reformed Church of Tacoma. We also affirm all other parts of the trial court's order, including defendants' liability for back rent and revenues, and dismissal of Sung's counterclaims with prejudice.

III. ATTORNEY FEES

¶31 Attorney fees may be awarded to a party under RCW 4.28.328 where the party prevails on a motion to cancel the lis pendens, or where the party prevails in defense of the action in which a lis pendens was filed unless substantial justification existed for filing the lis pendens. Since Sung does not prevail in this action, he is not entitled to fees.

¶32 We affirm.

VAN DEREN, C.J., and BRIDGEWATER, J., concur.

Review denied at 169 Wn.2d 1009 (2010).

---

[19] It is worth noting that the findings of fact and conclusions of law were derived from the trial court's January letter of decision. It is possible that the conversational tone from the original letter simply does not translate to formal findings and conclusions.