IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 30702-6-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHRISTOPHER MICHAEL WINKLER, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Following a residential burglary at the rural home of Katie Clark, two neighbors, along with Ms. Clark's parents, undertook a search for the burglar in the surrounding woods. The two neighbors encountered and detained Christopher Winkler at gunpoint. He was then placed under arrest by Ms. Clark's father, an off-duty state trooper. For the first time on appeal, Mr. Winkler argues that (1) his original detention was an unconstitutional citizen's arrest, (2) Trooper Clark lacked probable cause for arrest, and (3) his lawyer's failure to file a suppression motion based on these constitutional violations constituted ineffective assistance of counsel.

Before this appeal, no one appears to have characterized the original detention as a citizen's arrest and Mr. Winkler has not demonstrated any basis for attributing it to the State. Trooper Clark was never given an opportunity to explain the information on which

he based his arrest of Mr. Winkler and the record does not reveal the manifest constitutional error that Mr. Winkler must show to raise this issue for the first time on appeal. Finally, Mr. Winkler has not shown that a motion to suppress would likely have been granted—a showing necessary to his claim of ineffective assistance of counsel. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

On an afternoon in mid-October 2011, Katie Clark and Christopher Immonen arrived home from work to find that their home had been burglarized. The couple lives in a trailer home located on 10 acres of wooded property owned by Katie's parents, Sheila and Kevin Clark. Among the items missing from the home were two televisions, an electronic game system, underwear, purses, wallets, and some food items. Ms. Clark's parents live on the same property, in a house closer to the street. Ms. Clark called her father, a Washington state trooper, and told him about the break-in. He asked her to come down the driveway to his house, where she placed a call to report the burglary to the county sheriff.

Meanwhile, Trooper Clark went to the mobile home where he was later joined by deputies responding to the call. After the deputies took the report and left, Trooper Clark began looking around in the woods behind the mobile home, having concluded that the burglar might not have reached his daughter's home via the driveway. That would require passing by his and his wife's home, and the trooper, who had been out and about

2

the house all day, had not seen anyone pass. As he walked down a trail in the woods, he found a number of items taken from his daughter's home, including a backpack with two laptop computers; controls for the game system; two televisions; an empty milk jug; and the wrappers from "Otter Pops," a frozen snack that he had earlier noticed spilled on the floor and out the back door of the mobile home.

After returning to the mobile home, and while the trooper was speaking with his wife and daughter, Robert and Matthew Nadeau (father and son) walked up, introduced themselves, and told the Clarks they were checking the area in response to a report by a mutual neighbor, Virginia Saunders, that someone had been prowling houses in the area earlier in the day. Ms. Saunders would later testify that she saw a man with a long ponytail and wearing sweatpants come out of the woods behind her house and peer into her window. When she confronted the man and asked him what he needed, he replied that he was looking for the road. After she directed him to it, the man explained that he needed to go back and get his backpack in the woods, which he did, passing by with a backpack that was full. Ms. Saunders called the sheriff about the incident in addition to informing some of her neighbors.

The Clarks and Nadeaus discussed the fact that it was getting to be night and they were unlikely to find anything more that evening, but they exchanged telephone numbers and agreed to get in touch the following morning. Not long thereafter, however, the Nadeaus called Trooper Clark to say that they had seen someone running through the

3

woods in the area where all of them had seen the empty milk jug. The Clarks joined the Nadeaus and then broke into separate parties in an effort to locate the person whom they could hear breaking through the brush. By this point, all four were armed with handguns or shotguns, and flashlights.

It was the Nadeaus that ultimately met up with Mr. Winkler, whom they encountered running toward them on a path. The Nadeaus "shouted commands for [the man] to stop, Are you police? And he said no." Report of Proceedings (RP) at 164. The Nadeaus demanded that Mr. Winkler drop to the ground and he quickly complied. Trooper Clark and his wife heard the yelling and ran to where the Nadeaus had Mr. Winkler on the ground. Trooper Clark identified himself as a police officer, informed Mr. Winkler that he was under arrest, and handcuffed him. He escorted Mr. Winkler out of the woods and handed him over to Deputy Damon Anderberg. Sheila Clark told the deputy that Mr. Winkler was wearing her daughter's underwear and the deputy took photographs at the scene, revealing that Mr. Winkler was wearing three pairs of women's underwear under his pants.

Following Mr. Winkler's arrest, officers found that he was wearing not only the stolen underwear, but a pair of stockings taken from Ms. Clark's home. He was also carrying one of her missing gloves. Other evidence offered at his trial was Ms. Saunders' identification that Mr. Winkler was the man she had seen looking in her own window on the day of the burglary, and that he had been eating an Otter Pop. Ms. Saunders had

4

provided a description of the man she reported prowling in the area, and that description fit Mr. Winkler.

Mr. Winkler was charged with residential burglary, a class B felony. RCW 9A.52.025(2). He chose not to testify. The jury found him guilty and he was sentenced to 50 months' confinement. He timely appeals.

## ANALYSIS

In deciding Mr. Winkler's appeal, we find it necessary to reformulate, somewhat, the several arguments presented by his brief. "An illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction." *United States v. Crews*, 445 U.S. 463, 474, 100 S. Ct. 1244, 63 L. Ed. 2d 537 (1980); *City of Pasco v. Titus*, 26 Wn. App. 412, 415-16, 613 P.2d 181 (1980) (stating that Washington law is in harmony with federal law, including *Crews*). It is the admission of evidence obtained incident to or as a result of illegal activity that can upset the conviction. *Titus*, 26 Wn. App. at 416.

Accordingly, his arrest, and what he now characterizes as the citizen's arrest, provide no basis for relief standing alone even if they were illegal, as he asserts. There is no need to analyze the arrests themselves as manifest constitutional error.

Mr. Winkler is entitled to relief on appeal only if evidence relied upon by the State should have been suppressed and he establishes either that the admission of the evidence

was manifest constitutional error or that he received ineffective assistance of counsel. We address those two propositions in turn.

I

Mr. Winkler did not move to suppress evidence obtained as a result of his arrest at the time of trial. RAP 2.5(a) states the general rule for appellate disposition of issues not raised in the trial court: appellate courts will not entertain them. *State v. Guzman Nuñez*, 160 Wn. App. 150, 157, 248 P.3d 103 (2011) (citing *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988)), *aff'd*, 174 Wn.2d 707, 285 P.3d 21 (2012). The reason for this rule is to afford the trial court an opportunity to correct errors as they are raised, thereby preserving the use of judicial resources. *Scott*, 110 Wn.2d at 685; *Smith v. Shannon*, 100 Wn.2d 26, 37, 666 P.2d 351 (1983).

However, RAP 2.5(a)(3) permits a party to raise initially on appeal a claim of "manifest error affecting a constitutional right." To establish manifest constitutional error, a criminal defendant must identify a constitutional error and make a showing that the error negatively affected his rights at trial. *State v. Kirkman*, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007). "It is this showing of actual prejudice that makes the error 'manifest,' allowing appellate review." *Id.* at 927 (citing *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995)). "If the facts necessary to adjudicate the claimed error are not in the record on appeal, no actual prejudice is shown and the error is not manifest." *McFarland*, 127 Wn.2d at 333.

6

Where an issue of suppression of evidence is raised for the first time on appeal, the relevant factual record before the trial court may be insufficient to show actual prejudice because neither the defendant nor the State has had the incentive or opportunity to develop the factual record before the trial court. In this case, however, Mr. Winkler argues that "all four individuals involved in Winkler's detention and arrest testified candidly about the events leading up to and forming the basis for the arrest." Br. of Appellant at 9.

Insofar as Mr. Winkler relies on what he characterizes as his "citizen's arrest" by the Nadeaus, he fails to demonstrate the threshold requirement of a constitutional right because he fails to demonstrate state action. Even if the court admitted evidence obtained by the Nadeaus or as a result of their detention of Mr. Winkler, the exclusionary rule does not apply to the acts of private individuals. *State v. Smith*, 110 Wn.2d 658, 666, 756 P.2d 722 (1988) (citing *State v. Wolken*, 103 Wn.2d 823, 830, 700 P.2d 319 (1985)). While the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution both protect an individual's right to privacy from government trespass, they apply only to searches by state actors. *Burdeau v. McDowell*, 256 U.S. 465, 475, 41 S. Ct. 574, 65 L. Ed. 1048 (1921); *State v. Carter*, 151 Wn.2d 118, 124, 85 P.3d 887 (2004).

In order to prove that a private individual was acting as a state actor, "'[i]t must be shown that the State in some way instigated, encouraged, counseled, directed, or

7

controlled the conduct of the private person.'" *Smith*, 110 Wn.2d at 666 (alteration in original) (internal quotation marks omitted) (quoting *Wolken*, 103 Wn.2d at 830). "[M]ere knowledge by the government that a private citizen might conduct an illegal private search without the government taking any deterrent action [is] insufficient to turn the private search into a governmental one." *State v. Agee*, 15 Wn. App. 709, 714, 552 P.2d 1084 (1976) (citing *Lustig v. United States*, 338 U.S. 74, 79, 69 S. Ct. 1372, 93 L. Ed. 1819 (1948)), *aff'd*, 89 Wn.2d 416, 573 P.2d 355 (1977). A close working relationship between the police and a private citizen may be "tantamount to joint action," and make the private citizen an agent of the State. *State v. Birdwell*, 6 Wn. App. 284, 288, 492 P.2d 249 (1972). But the fact that there are contacts between the police and a private citizen does not make that private citizen an agent. *State v. Walter*, 66 Wn. App. 862, 866, 833 P.2d 440 (1992). An attempt to aid the government does not change a private search into a governmental search. *State v. Ludvik*, 40 Wn. App. 257, 263, 698 P.2d 1064 (1985).

The trial record that Mr. Winkler relies upon as adequate shows that the Nadeaus began their own search for a prowler before encountering Trooper Clark. Mr. Winkler points to no evidence that their actions in detaining him were instigated, encouraged, counseled, directed, or controlled by the State. The detention appears to be a continuation of their private conduct. Although it followed their contact with Trooper Clark, the trooper had expressed the view that they were not going to find anyone that

night, that he would be reporting what he had learned to the sheriff's department, and the next morning they could go out "as private citizens and go see what we could find." RP at 106. There is no evidence the Nadeaus believed or had reason to believe that they were acting at the direction or under the control of law enforcement. Without state action, any error in admitting evidence attributable to the Nadeaus' detention of Mr. Winkler is not constitutional error and may not be raised for the first time on appeal.

Mr. Winkler alternatively argues that it was manifest error to admit evidence attributable to Trooper Clark's warrantless arrest, because he lacked probable cause to make the arrest. Under article I, section 7 of the Washington Constitution, warrantless searches or seizures are presumed invalid unless the State shows an exception applies. *State v. Grande*, 164 Wn.2d 135, 141, 187 P.3d 248 (2008). Among the exceptions are that police officers may make warrantless arrests based on probable cause to believe that the arrestee has committed or is committing a felony, RCW 10.31.100, or that he has committed or is committing a misdemeanor or gross misdemeanor involving criminal trespass under RCW 9A.52.070 or 9A.52.080. RCW 10.31.100(1). An off-duty police officer not acting in his official capacity maintains the authority of an on-duty officer to make arrests. *State v. Graham*, 130 Wn.2d 711, 719, 927 P.2d 227 (1996); *State v. Hendrickson*, 98 Wn. App. 238, 243, 989 P.2d 1210 (1999).

A claim that Trooper Clark lacked probable cause for the arrest raises constitutional error. We therefore must consider whether he did lack probable cause for

9

the arrest and, as a threshold matter, whether the facts necessary to adjudicate the claimed error are in the record and, if they are, whether the error was manifest.

Probable cause exists when the arresting officer knows facts and circumstances, based on reasonably trustworthy information, sufficient to justify a reasonable belief that an offense has been committed. *State v. Gaddy*, 152 Wn.2d 64, 70, 93 P.3d 872 (2004); *State v. Vasquez*, 109 Wn. App. 310, 318, 34 P.3d 1255 (2001), *aff'd*, 148 Wn.2d 303, 59 P.3d 648 (2002). The objective inquiry is based on practical considerations, not legal technicalities. *State v. Bellows*, 72 Wn.2d 264, 266-67, 432 P.2d 654 (1967). The officer need not have evidence to prove each element of the crime beyond a reasonable doubt. *Gaddy*, 152 Wn.2d at 70. However, probable cause must be based on more than a bare suspicion of criminal activity. *State v. Terrovona*, 105 Wn.2d 632, 643, 716 P.2d 295 (1986).

Here, the record establishes that Trooper Clark knew his daughter's home had been burglarized earlier in the day. His presence at his own home that morning and discovery of stolen items while searching the woods gave him reason to believe that the burglar had arrived and left through the woods. Based on his testimony that he recognized items as among those missing from his daughter's home, it is a reasonable inference that he and she had talked about what was missing. He knew from the Nadeaus that a man had been seen prowling other homes in the area earlier in the day. Because he lived in the area and knew the owner of the property where Mr. Winkler was heard

10

running, he had some basis for judging whether a person on the property had business being there.[1]

Shortly before the warrantless arrest, the trooper received a call from Matthew Nadeau reporting that they had seen someone running through the woods. When the Clarks arrived at the location where the Nadeaus had seen someone, Trooper Clark could hear the crashing of someone moving through the brush, which he characterized as "getting faster and running and a little more of like a panicked movement." RP at 108-09. When the Nadeaus called out and the trooper arrived at where they were detaining Mr. Winkler, the trooper noticed "something unusual . . . When [Mr. Winkler] was proned out on the ground and he brought his feet back down, both from his exertion and running through the woods, he was wearing sweatpants that had started to sag down, and I noticed Mr. Winkler was wearing what appeared to be women's underwear." RP at 112. The trooper's attention to what Mr. Winkler was wearing and his wife's report to Deputy Anderberg shortly thereafter that the underwear he was wearing was among Katie's missing garments suggest that the Clarks knew that women's underwear was among the stolen items—even if the trooper was unable to "identify" it as belonging to his daughter. *Id.*

---

[1] Trooper Clark testified that he had cleaned up the property for its owner after "Ice Storm," a destructive storm that we can take judicial notice took place in the Spokane area in November 1996. RP at 107.

11

Critically, because Mr. Winkler never raised an issue of suppression, Trooper Clark was never asked about the facts he relied upon in making the warrantless arrest. Mr. Winkler argues that the existing record is adequate to determine whether the trooper lacked probable cause because Trooper Clark, like the others, "testified candidly about the events leading up to and forming the basis for the arrest." Br. of Appellant at 9. But he overstates the record; the trooper was never asked, directly or indirectly, about the basis for the arrest.

While the trooper had no occasion to particularize what he observed in encountering Mr. Winkler that gave rise to his belief that an offense had been committed, the available record suggests that the trooper might have had probable cause. He did not offer an explanation for making the arrest that *fell short* of probable cause. Accordingly, the facts necessary to determine whether probable cause existed are not in the record on appeal. Mr. Winkler also fails to show that the State's evidence would not have been admitted regardless of the trooper's arrest. The Nadeaus detained Mr. Winkler after calling the sheriff's department to report that they were in pursuit of someone, and with Deputy Anderberg already en route. Ms. Saunders's ability to identify Mr. Winkler was not traceable to his arrest by Trooper Clark. "Without an affirmative showing of actual prejudice, the asserted error is not 'manifest' and thus is not reviewable under RAP 2.5(a)(3)." *McFarland*, 127 Wn.2d at 334.

II

Mr. Winkler contends he received ineffective assistance when his counsel failed to challenge his unlawful arrest or attempt to suppress the evidence. The Sixth Amendment and article I, section 22 of the Washington State Constitution guarantee the right to counsel, including that a defendant's lawyer perform to the standards of the profession. *State v. Hawkins*, 157 Wn. App. 739, 747, 238 P.3d 1226 (2010).

By claiming ineffective assistance, Mr. Winkler can raise the same claimed errors discussed in section I, for the first time on appeal, and without having to demonstrate that they were constitutional or manifest. He must make two other showings, though: that his lawyer's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Nichols*, 161 Wn.2d 1, 8, 162 P.3d 1122 (2007). If a party fails to satisfy one element, a reviewing court need not consider both *Strickland* prongs. *State v. Foster*, 140 Wn. App. 266, 273, 166 P.3d 726 (2007). A claim for ineffective assistance presents a mixed question of law and fact, which we review de novo. *State v. Cross*, 156 Wn.2d 580, 605, 132 P.3d 80 (2006); *State v. Cham*, 165 Wn. App. 438, 445, 267 P.3d 528 (2011), *modified on remand*, noted at 172 Wn.2d 1002 (2012).

Courts are highly deferential to counsel's decisions and there is a strong presumption that counsel performed adequately. *Strickland*, 466 U.S. at 689-91. Strategic and tactical decisions are not grounds for error, but where there is no

13

conceivable legitimate tactic explaining counsel's performance, this court will reverse. *Id.*; *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). The remedy for a lawyer's ineffective assistance is a new trial. *State v. Crawford*, 159 Wn.2d 86, 107, 147 P.3d 1288 (2006).

Where the deficient performance alleged is a failure to challenge the admission of evidence, the defendant must show (1) an absence of legitimate strategic or tactical reasons supporting the challenged conduct, (2) that an objection to the evidence would likely have been sustained, and (3) that the result of the trial would have been different had the evidence not been admitted. *State v. Saunders*, 91 Wn. App. 575, 578, 958 P.2d 364 (1998).

The record does not suggest, nor can we conceive of a reason, for forgoing a motion to suppress other than anticipation it would be unsuccessful, which we address in connection with the defendant's second required showing. The defense theory was that there was a lack of evidence linking Mr. Winkler to the crime. Suppressing all evidence resulting from his detention and arrest would have advanced that theory.

Mr. Winkler fails, though, because he cannot demonstrate that a motion to suppress the evidence would likely have been successful. As discussed above, it is unlikely the trial court would have been persuaded that the Nadeaus were state actors, so their detention of Mr. Winkler would not provide a basis for suppression. As to Trooper Clark's arrest, the record is inadequate to determine the basis for his conclusion that there

14

was probable cause, although what evidence is available suggests that he had a sufficient basis for arrest and that a motion to suppress would likely be denied. *Cf. McFarland*, 127 Wn.2d at 334 n.2, 337 n.4 (finding that suppression was unlikely where the officer had information suggesting the defendant was tied to the crime and probable cause for a warrantless arrest was not raised in the trial court).

"The burden is on a defendant alleging ineffective assistance of counsel to show deficient representation based on the record established in the proceedings below." *Id.* at 335. If demonstrating deficient representation requires evidence or facts not in the existing trial record, the appropriate means of challenging counsel's effectiveness is through a personal restraint petition. *Id.*

Finding no error or ineffective assistance, we affirm.

A majority of the panel has determined that this opinion will not be printed in the Washington Appellate Reports but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, C.J.

_____
Kulik, J.

15