**FILED**
**MARCH 8, 2018**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 34417-7-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RICHARD ELLIOT CAIN, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, C.J. — Richard Cain appeals from a conviction of child molestation. He contends the trial court erred when refusing to suppress seized evidence of bondage instruments and when failing to deliver a limiting instruction concerning evidence of the victim's fear of Cain. We find no error and affirm.

FACTS

This prosecution alleges ongoing sexual contact forced by appellant Richard Cain on the underage daughter of Cain's former girlfriend, Lisa Madson. Cain and Madson engaged in a sporadic relationship from 2004 to 2010. Madson had two children borne of a prior relationship: the alleged victim Erin, a girl born in 1999, and a boy Uriah, born in 2002. When cohabitating, Cain and Madson resided in various homes, the latest of which was Cain's Prosser mobile home. In March 2009, Madson bore Cain's daughter, Julie.

We bestow fictitious names on all three children.

Lisa Madson worked various jobs in Prosser while cohabitating with Richard Cain and raising her children. Cain spent much time alone with the children due to Madson's work schedule. Not long after Julie's first birthday in 2010, Madson and Cain separated permanently, with Madson and the three children moving into a Prosser apartment. Cain thereafter occasionally came to the apartment to care for the children in Madson's absence.

The State contended that Richard Cain's sexual practices bore relevance to this prosecution. Cain frequently tied girlfriend Lisa Madson for his sexual gratification during intercourse. Cain possessed ropes, ties, and handcuffs to bind either Madson's hands or feet depending on the couple's desired sexual position. Cain admitted during trial testimony that he enjoys restraining a woman during sex if the woman desires such.

Erin cannot recollect specific dates that Richard Cain molested her, but states that the abuse occurred from July of 2006 to April of 2011, when Erin was between ages six and ten. The abuse occurred in a series of residences, in which Cain, Lisa Madson, and Madson's children resided.

According to Erin, Richard Cain first sexually touched her after school one day during her mother's absence. Erin, as part of her weekday routine, finished her homework and watched television when Cain hoisted Erin, carried her into Cain's bedroom, and placed her on his bed. During trial testimony, Erin described the first act

2

of molestation as Cain rubbing his penis against her vagina and buttocks. She did not respond for fear of being physically struck. Erin described the abuse as ongoing. She recalled situations when Cain placed his mouth on or around her pelvic region, placed her hand on Cain's penis, and rubbed his penis in and around her buttocks and genitals. Erin also testified that Cain bound her hands with the tie from her mother's robe and then touched her genitals.

During trial testimony, Uriah Madson remembered Richard Cain and Erin spending time after school locked inside Cain's bedroom. Joanne Carow, Lisa Madson's mother, testified that she noticed Cain showing Erin more affection than Uriah and remembered Erin and Cain once snuggled on the couch, while Erin wore no shirt.

After separating with Richard Cain, Lisa Madson discovered, in her apartment, a drawing of a human body with a penis. A perturbed Madson confronted Erin and Uriah as to the drawer of the obscene image. Uriah admitted to drawing the picture. Lisa then asked her two oldest children if either had been touched inappropriately, and Erin responded affirmatively. After Erin disclosed the abuse, Madson destroyed the robe from which Cain took the tie to bind Erin's hands.

Erin Madson had not earlier revealed the misconduct of Richard Cain because of fear of Cain, Cain's instruction to remain silent, an understanding that no one would believe her accusations, and a desire to avoid the subject of the abuse. To explain her fear at trial, Erin testified to Cain owning a gun and to an instance when Cain shot and

3

killed a bunny rabbit outside their home. Erin also averred that Cain spanked her as a form of discipline.

Lisa Madson informed law enforcement of Erin's disclosure of sexual misconduct of Richard Cain. Law enforcement then conducted a forensic interview and a physical examination of Erin. Law enforcement also sought a warrant to search the home of Cain and to seize evidence of sexual molestation from the home. Benton County Sheriff Deputy Scott Runge declared, in support of the warrant:

> Yesterday when Lisa [Madson's] children came home from school she found a drawing her son had done. . . . She pulled her two oldest children aside . . . and asked them if anyone has touched either of them inappropriately. . . . [Erin] replied yes. . . .
> She [Lisa Madson] asked [Erin] who touched her inappropriately and she replied (SU) [suspect] Richard Cain. She asked [Erin] how he touched her.
> [Erin] replied to her mother he used to make her lay on her stomach on their bed. He would then cover her head with a pillow, sometimes even making it hard for her to breath. Sometimes he would use a bathrobe rope and tie her hands behind her back. He would then touch her vagina with his fingers, mouth, and penis. . . . Lisa asked [Erin] when this happened. [Erin] replied it has happened several times from when they lived with Richard at his current address, and when he would come over and baby sit them when they lived in an apartment in Prosser. Lisa was unable to find out when the last time anything sexual occurred between [Erin] and Richard, however stated Richard watched all of the children approximately 1 to 2 weeks ago.
> . . . .
> . . . I [Deputy Carrigan] asked if she [Lisa Madson] thought [Erin] was telling her the truth and she said yes. She says the things [Erin] says Richard did to her are things Richard did to her when they were dating. She explained Richard used to have her lay on her stomach and would tie her hands behind her back with her robe rope. I asked if there were any letters from Richard or videos they could have made together that would

4

put these thoughts in [Erin's] head.  She advised she and Richard have made videos in the past of them having sex, however there is no way [Erin] could have gotten a hold of them. . . .

. . . .

An appointment was made for [Erin] to be interviewed . . . [at the local sexual abuse resources center]. . . .

. . . .

Madson went on to tell me [Detective Scott Runge] about some of the things [Erin] had told her.  Madson stated that she felt that [Erin's] comments were true because Cain did the same type things to her during their sexual relationship.  I asked her to clarify and Madson went on to say that [Erin] described being bound with a robe strap and was referred to as a prisoner or slave.  Madson stated that she too was bound with robe straps and referred to as a prisoner and slave.

. . . .

[During the interview of Erin by forensic interviewer Mari Murstig], Mari began the interview again and stated, "I heard about something involving a robe."  [Erin] stated that he would tie her up with the bath robe's "Fuzzy Belt" so she would squirm around or move.  She stated that he would tie up her hands and feet.

[Erin] stated that Cain used two of her mother's robes.  She described the robes as being one with clouds and one with hearts and polka dots.

. . . .

[Erin] then recalled about how Cain would perform oral sex on her and stated, "When I looked down I felt like I was gonna puke."  "I would put a pillow over my head so I wouldn't look down."

. . . .

At l200 hrs, Prosecutor Anita Petra, [Child Protective Services] (CPS) Social Worker Rosa Valdez, [Erin's] mother Lisa Madson and I [Detective Scott Runge] went to the conference room to discuss the process of the case.

. . . .

I then asked Madson about her sexual relationship with Cain.  I was referring to the information that she discussed over the phone.

Madson stated that she too would have her hands bound by the robe strap.  She stated that Cain had a fetish for binding and would use scarves, a robe, and even other items from past relationships to bind her hands and

5

feet. She stated that he would even put a pillow over [her] head. She described it as him being in control. . . .

. . . .

Madson stated that during their sexual history that he also had a fetish for videotaping and photographing their sexual sessions. She stated that he had many tapes and she had some too. She stated that during one of their break ups she had erased all of his tapes and destroyed hers. She stated that since her break up they had made more and that he would probably still have possession of them. She stated that contained within the tapes would be sex acts that she described as above and the same type of communications.

. . . .

We then asked Madson about the robes she had. Madson stated that she discarded them because she read on the Internet that it was good for a child to not be reminded of things that would bring them to their sexual assaults. She did describe her robes as being blue and white with clouds and white, pink, and red polka dot that was valentine themed. She stated that she still had the brown pillow.

I asked her about the brown pillow and she stated that [Erin] disclosed to her that Cain would use the pillow to prop her up when he had her in a bent over position. I told her that we would like to take possession of the pillow for the case. I asked her how she came about the information about the pillow and she stated that when she discovered the information on the Internet she asked [Erin] about any items in the house that reminded her of Cain and [Erin] pointed out the robes and pillow.

. . . .

Since there is a correlation between Cain's fetish for binding and communicating the same type verbal fantasies during sexual acts between [Erin] and Madson it is also reasonably presumed that Cain may have video or digital media of his sex acts with [Erin] as he did with Madson.

WHEREFORE, I request that a search warrant issue for the purpose of searching . . . [Richard Cain's mobile home] . . . and to seize:

. . . Photographs of the residence and bedroom of Richard Elliot Cain

. . . Rope, scarves, robe straps, or any other items that can be used for binding;

. . . All VHS and 8 mm video tapes and all electronic storage mediums; including but not limited to Computers, External Hard Drives, CD's, Floppy Disks, Diskettes, Digital Cameras, IPODS, Cellular Phones

6

with Camera Feature, and Flash Drives that could be used to contain
depictions of sexual acts of the victim;
. . . Documents of Dominion.

CP at 33-44. The June 15, 2011, warrant authorized the seizure of:

(1) Photographs of the residence and bedroom of Richard Elliot Cain
(6/11/65);
(2) Ropes, scarves, ties or any other device that can be used for
binding;
(3) Any VHS, 8 mm, photographs, electronic storage devices to
include but not limited to computers, hard drives, CDs, floppy disks,
diskettes, iPods, cell phones w/camera features, and flash drives that could
be used to store any depictions of child pornography;
(4) Documents of dominion.

CP at 32.

Benton County Sheriff Detective Scott Runge and other law enforcement officers

executed the search warrant at Richard Cain's home on June 16, 2011. Law enforcement

discovered VHS tapes of Cain and Lisa Madson engaged in sexual acts of bondage. Law

enforcement took photographs of purported bondage instruments, including

handkerchiefs, scarves, belts, a ball gag, handcuffs, nylon bindings, ropes, a leather whip,

and a paddle. A drawer underneath the home's bed contained handkerchiefs and scarves

wound in a fashion to be used as bindings.

Investigating officers also discovered evidence of an unlawful marijuana

enterprise in Richard Cain's residence, so they withdrew after one hour of searching to

request a telephonic amendment to the warrant. The trial court granted an amendment

that authorized entry into outbuildings, opening of cargo containers, and seizure of

marijuana and drug paraphernalia.

PROCEDURE

The State of Washington first charged Richard Cain with a crime in June 2011. By December 2012, the State had amended its information twice and charged Richard Cain with one count of first degree rape of child and one count of first degree child molestation. Both charges requested aggravated sentences due to Cain's abuse of a position of trust and confidence over Erin. The State did not allege a specific date for the rape or a precise date for an act of molestation, but alleged criminal acts occurred between July 10, 2006, and April 1, 2011.

Richard Cain's first trial resulted in a mistrial because of a hung jury. A jury convicted Cain on both counts during a second trial. The trial court later granted Cain a motion for new trial because of a violation of the right to counsel.

In a series of motions thereafter, Richard Cain sought suppression of all evidence seized from his home based on the invalidity of the search warrant. In response, the trial court suppressed the video of Richard Cain and Lisa Madson engaging in sexual bondage, any electronic information found inside Cain's home, and evidence relating to marijuana distribution. The trial court found the order authorizing seizure of all videotapes to be overly broad and ruled that the warrant did not authorize confiscation of videos depicting sexual conduct between Madson and Cain. The trial court declined to suppress the photographs of bondage materials and dominion documents. The court

concluded, against Cain's contention, that the search for bondage devices and dominion documents could be severed from the invalid parts of the warrant.

Before the third trial, Richard Cain requested exclusion of evidence of any of his purported intimidating, aggressive, or violent acts unless directly witnessed by Erin and exclusion of evidence of Erin's fear of Richard Cain after her first allegations against him. The State agreed to both requests. The trial court in particular precluded testimony pertaining to Erin sleeping in bed with Lisa Madson for a year from fear of Cain and Madson's shielding of a home window. In acquiescing to Cain's request, the State warned Cain that it intended to present testimony from Erin of hostile discipline imposed on her by Cain and testimony from Uriah of discipline on Uriah that Erin observed.

During his testimony in the third trial Uriah testified to corporal punishment meted by Richard Cain. Uriah stated that Cain hit him with Cain's hands and with a wooden paddle. During her testimony, Erin explained her reasons for not earlier reporting to her mother or others the abuse by Richard Cain. She mentioned Cain's spankings. Erin explained that, when Cain disciplined her, Cain directed her to place rocks from a hill into a bucket. If rocks fell from the bucket or she placed excessive rocks in the bucket, Cain struck her. Erin emphasized her small size compared to the body size of Cain. She saw Cain with guns. He once shot a bunny in the garden, and Erin wondered why he would shoot an innocent animal.

During trial, the trial court admitted photographs pertaining to bondage equipment. The State relied on the photographs during closing.

Richard Cain requested a jury instruction that directed the jury to consider evidence of his earlier conduct surrounding discipline and use of guns only for the purpose of weighing the credibility of witnesses. The proposed instruction read:

> Certain evidence has been admitted in this trial for only a limited purpose. This evidence consists of testimony that Mr. Cain committed acts of physical and emotional abuse. That testimony may be considered by you only for the purpose of determining the credibility of the State's witnesses. You may not consider it for any other purpose. Any discussion of the evidence during your deliberations must be consistent with this limitation.
> WPIC 5.30 (modified)

CP at 385. During a mid-trial conference, Cain advocated for use of his proposed limiting instruction in accordance with ER 404:

> THE COURT: Then the last one that you [defense counsel] proposed was "the evidence was offered for a limited purpose." That's your proposed instruction number five.
> Are you still proposing it?
> MR. MARSHALL [Defense counsel]: Yes, your Honor.
> THE COURT: Go ahead and explain your thought process for that one, please.
> MR. MARSHALL: Well, this is evidence—you know, the evidence that Mr. Cain committed acts of physical and emotional abuse, that's evidence of bad acts. We do not, under Rule 404, allow evidence of prior bad acts to be admitted at trial to prove that a person's behavior on another occasion was in conformity with the bad character shown in those acts.
> That is always a risk when bad acts evidence comes in, and this is the court's opportunity to tell the jury, "No, you're not to use it for that purpose. You are to use it only to determine the credibility of the State's witnesses if you feel that it explains something about"—
> THE COURT: And how does this—how is this probative on the

10

credibility of any witness, and I guess you have to be specific as to the
witness.

MR. MARSHALL: Happy to do that.

. . . The State is arguing she [Erin]—she has said that she did not tell
sooner that she was being molested by Mr. Cain because she was afraid of
him. So, the acts of physical and emotional abuse that he's alleged to have
perpetrated upon her would support her contention that she was too afraid
of him to tell.

That's how it bears on her credibility, your Honor.

THE COURT: Ms. Petra?

MS. PETRA [Prosecuting attorney]: Your Honor, I'd ask to give me
a little bit more time to look at this. You know, it's definitely evidence in
this case. It's not just being admitted to show that the child feared him, but
it also goes to the relationships between the parties. It goes to the
credibility of [Uriah] as well. I would just like to have an opportunity to
look at the case law supporting that.

If it is, I definitely believe it needs to be included. To do so—to not
do so would be concerning. I just would like to—this is more so
concerning criminal convictions not necessarily for 404(b).

So, I just need to look at that if I could?

Report of Proceedings (RP) at 1036-38. During this argument, defense counsel never

mentioned ER 105. The trial court reserved a ruling in order to allow the State to

consider the need for a proposed limiting instruction.

During the final jury instruction conference, the trial court directed the parties to

state any exceptions to the jury instructions. Richard Cain objected to two of the trial

court's instructions, but did not comment about his proposed limiting instruction, which

the court did not include in its instructions. The trial court then read the jury instructions

to the jury. After completing the reading of the instructions to the jury but before closing

arguments, the court discussed, with counsel outside the hearing of the jury, Richard

Cain's proposed limiting instruction:

> THE COURT: . . . As I was reading, I noticed that I did not give the instruction on the limited value—.
>     . . . of abuse or neglect, and that was intentional on my part. I don't believe that evidence is so limited—I don't think it was limited to credibility. It was more offered to explain why the alleged victim did not raise her complaints, and I'm sorry, but I wanted to bring you at side bar so that nobody guessed about that later on and give you some time to think now as I read the instructions about how you might do your closings.
>     MS. PETRA: Right.
>     MR. MARSHALL: Sure. Your Honor, I will take exception to the court's not giving that instruction.

RP at 1073-74.

On appeal, Richard Cain emphasizes the following comments made by the

prosecution during closing argument:

> Do you believe the defendant? Who in this courtroom, the only person who has a motive to be dishonest to you? That man (indicating). He's the only one. Did you evaluate his manner while testifying? What did you think? Did he come off as coached? That little banter that they had. Did you feel that he was robotic? Did you feel he was controlling? Did you get a mean vibe from him?
>     It's no wonder these children were scared of the defendant, and did you think his testimony was reasonable in the context of all the other evidence?

RP at 1096-97. The State continued during summation:

> Why did she not tell? All of . . . you [are] gonna go back there and think about that. Why didn't she tell her grandmother? Why didn't she tell the counselor? Why didn't she tell her friend? Why do kids not tell? Why do kids not tell? She was scared of him. Do you have any doubt that she was scared of him? Is there any doubt?
>     You saw his manner up there testifying. You think that's a warm cat? Warm guy to hang out with? I mean, you see all those pictures where

they give you like three of 'em.  I mean, what's the first thing—what's the first thing a child does when a mother puts a camera in front of 'em?  I mean, how many mug shots are people smiling in them?  Is it strange that [Erin] would be smiling when a picture was taken of her?  On the one occasion that they went camping in four years?

He had guns.  Tons of guns.  You saw—you heard how many guns he had.  He had guns.  He even told you he would kill coyotes, stray dogs.  You know what else he killed?  Little bunnies in front of [Erin].  You think that freaked her out?  He kept food from her.  He would hit her.  And her brother.  And he was a black belt in Karate.  We learned a lot about that over the course of this trial.

RP at 1106.

After completion of closing arguments, the trial court dismissed the jury and the

following colloquy took place:

MR. MARSHALL [Defense counsel]: All right.  I do want to amplify my exception to the court's not giving the limiting instruction that we had proposed, the instruction that the jury not consider evidence of physical or emotional abuse by Mr. Cain except as it bore on credibility of the State's witnesses.

We object to the court's refusal to give that instruction on the basis that it violates Mr. Cain's rights to due process of law under the State and federal constitutions and, to make sure the record is completely clear on this, I will now ask the court to give that as a supplemental instruction since I'm doing this because I didn't take the exception before the court gave the initial packet of instructions.

. . . .

THE COURT: Okay.  Well, the case has now been argued without that instruction.  I think it would be clear error to give the instruction at this point in time, and, besides, I did not give it because, as I stated earlier, I believe that evidence was probative on more than just the credibility of [Erin].  It was probative on the question of why she delayed in reporting.

RP at 1138-40.  During this argument, defense counsel never mentioned ER 105.

The jury found Richard Cain not guilty of first degree rape of a child.  The jury

declared Cain guilty of first degree child molestation with a position of trust aggravator.

LAW AND ANALYSIS

Seizure of Bondage Apparatuses

On appeal, Richard Cain challenges the trial court's denial of his motion to

suppress the photographs of bondage instruments found in his mobile home during the

law enforcement search and the trial court's refusal to deliver a limiting instruction to the

jury concerning the purpose of testimony of hostile acts against Erin and Uriah.  The

second category in the search warrant authorized seizure of ropes, scarves, ties or any

other device that can be used for binding, not photographs of the devices.  We assume,

nonetheless, that we analyze photographs of the bondage devices as if the pictures

constitute the actual devices.  As to his first assignment of error, he contends that law

enforcement lacked probable cause to search his home for bondage devices, the search

warrant's authorization to seize evidence of bondage was overly broad, and defects in the

warrant allowing seizure of other evidence demand the annulment of the entire search

warrant.  We address these contentions in such order.

*Issue 1: Whether law enforcement held probable cause to search Richard Cain's*

*home for instruments of bondage?*

*Answer 1: Yes.*

Richard Cain first seeks to invalidate the search warrant's permission to seize

14

physical evidence of bondage because of a lack of probable cause. Cain emphasizes statements from Erin and Lisa Madson placed in Detective Scott Runge's affidavit for the search warrant that, when juxtaposed, indicate law enforcement knew Madson had destroyed the robe Cain used to restrain Erin and a brown pillow Cain employed to prop Erin. Cain argues that these facts defeat probable cause for category two of the search warrant that authorized the seizure of ropes, scarves, ties, or any other device that can be used for binding. Because of evidence of other bondage devices, we disagree with Cain.

Article I, section 7 of the Washington State Constitution requires that a search warrant issue only upon a determination of probable cause by a neutral magistrate. *State v. Myers*, 117 Wn.2d 332, 337, 815 P.2d 761 (1991). Probable cause exists when facts and circumstances suffice to establish a reasonable inference that the defendant involves himself in criminal activity and that the locus of the search contains evidence of the crime. *State v. Maddox*, 152 Wn.2d 499, 505, 98 P.3d 1199 (2004). Probable cause requires (1) a nexus between criminal activity and the item to be seized, and (2) a connection between the item to be seized and the place to be searched. *State v. Thein*, 138 Wn.2d 133, 140, 977 P.2d 582 (1999). An affidavit supporting a search warrant must show a probability of criminal activity. *State v. Ellis*, 178 Wn. App. 801, 805-06, 327 P.3d 1247 (2014). Evidence obtained from a warrant issued without probable cause should be suppressed under the fruit of the poisonous tree doctrine. *State v. Eisfeldt*, 163 Wn.2d 628, 640, 185 P.3d 580 (2008). Generally, we resolve doubts regarding probable

15

cause in favor of the validity of the search warrant. *State v. Chenoweth*, 160 Wn.2d 454, 477, 158 P.3d 595 (2007).

The search warrant affidavit of Detective Scott Runge established that Richard Cain likely committed the crime of sexual molestation, if not rape, of a minor child. The affidavit also established that Richard Cain possessed the propensity to tie and bind a woman when engaging in sexual conduct and misconduct. Evidence supporting this propensity would confirm the accuracy and credibility of Erin's accusations against Cain. Ropes, scarves and other objects that Cain could use to tie women thereby possessed a nexus to the criminal activity.

Richard Cain complains that law enforcement knew that Lisa Madson discarded her two robes and possessed the brown pillow. Because Madson possessed the pillow at her new residence, law enforcement would not find the pillow in Cain's mobile home. We agree with Cain that Detective Scott Runge knew that law enforcement would not find the two robes and the pillow in Cain's home. Nevertheless, Cain misperceives the extent and import of the search warrant and Detective Runge's supporting affidavit. The search warrant did not authorize the seizure of any pillow. The search warrant did not specify the seizure of any particular robe. The warrant authorized the seizure of any object that could bind a person. Other objects that could be used to bind could be found in Cain's residence despite the absence of the two robes and the brown pillow from the abode. The search warrant affidavit declared that Lisa Madson disclosed that Cain used

objects other than the robes, such as scarves, to bind her hands and feet.  Any such

objects would hold relevance to the alleged crime.

*Issue 2: Whether language in the search warrant authorizing the seizure of "any*

*other device that can be used for binding" is overbroad?*

*Answer 2: No.*

Richard Cain also attacks the warrant language "or any other device that can be

used for binding" as overbroad.  Br. of Appellant at 26.  He argues the wide language

unlawfully permits officers to conduct a general search and thereby rummage through his

home for any object that conceivably could be used as a restraint.  Since the search

warrant language authorized materials directly relevant to the crime, we disagree.

The Fourth Amendment to the United States Constitution requires warrants to

particularly describe the objects to be seized.  *State v. Besola*, 184 Wn.2d 605, 607, 359

P.3d 799 (2015).  The search warrant particularity requirement prevents general searches,

prevents the seizure of property on the mistaken assumption that it falls within the issuing

magistrate's authorization, prevents the issuance of warrants on loose, vague, or doubtful

bases of fact, and informs the person subject to the search of the items the officer may

seize.  *State v. Riley*, 121 Wn.2d 22, 29, 846 P.2d 1365 (1993).

Search warrants must enable the searcher to reasonably ascertain and identify the

property that the warrant authorizes to be seized.  *State v. Perrone*, 119 Wn.2d 538, 546,

834 P.2d 611 (1992).  The requirements of particularity should be evaluated in light of

practicality, necessity and common sense. *United States v. Ventresca*, 380 U.S. 102, 108, 85 S. Ct. 741, 13 L. Ed. 2d 684 (1965); *State v. Perrone*, 119 Wn.2d at 546. Accordingly, the degree of specificity required in the warrant varies according to the circumstances and the type of items involved. *United States v. Krasaway,* 881 F.2d 550, 553 (8th Cir. 1989); *State v. Helmka*, 86 Wn.2d 91, 93, 542 P.2d 115 (1975). As to most search warrants, a description suffices if it is as specific as the circumstances and the nature of the activity under investigation permits. *United States v. Blum*, 753 F.2d 999, 1001 (11th Cir. 1985); *State v. Perrone*, 119 Wn.2d at 547.

The Benton County Sheriff's Office catered its request for permissible property for seizure to the crime, for which proximate cause existed, child molestation. Erin stated that Richard Cain often bound her during sex acts. Thus, law enforcement reasonably sought to appropriate instruments used for binding. The use of a generic term or a general description does not per se violate the particularity requirement. *State v. Perrone*, 119 Wn.2d at 547. Particularity and probable cause requirements inextricably intertwine. *United States v. Stubbs*, 873 F.2d 210, 212 (9th Cir. 1989). Identifying the existence of probable cause to seize all items of a certain type described in the warrant is one measure of sufficiency of the description of items to be seized. *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986).

We wonder if Detective Scott Runge could have requested a definitive list from Lisa Madson and Erin of instruments utilized by Richard Cain when respectively tying

18

each of them, and, then, in turn, Runge could have limited the search warrant to this list. We question, however, if either woman, particularly Erin, could remember each bondage instrument. We also know of no rule that requires law enforcement to precisely list each discrete instrument of crime and of no rule that limits a warrant to such an exact list. Cain does not argue for such a rule.

Richard Cain complains that authorization to seize any device that could be used for bondage failed to limit the location of the search to his bedroom or the bathroom where the abuse allegedly occurred. This argument assumes, however, that Cain would store bondage devices inside the mobile home only in the bedroom and bathroom.

Richard Cain cites three Washington Supreme Court decisions as supporting his contention: *State v. Besola*, 184 Wn.2d 605 (2015); *State v. Reep*, 161 Wn.2d 808, 167 P.3d 1156 (2007); and *State v. Perrone*, 119 Wn.2d 538 (1992). All three decisions involved prosecution for pornographic materials, which possess First Amendment protections. Warrants for materials protected by the First Amendment require a heightened degree of particularity. *State v. Perrone*, 119 Wn.2d at 547-48. Cain cites no decision that grants bondage devices the shield of the First Amendment.

*Issue 3: Whether the trial court properly severed the authorization to seize instrumentalities of bondage from unlawful sections of the search warrant?*

*Answer 3: Yes.*

The trial court upheld those portions of the June 2011 search warrant that permitted seizure of bondage instruments and documents of Richard Cain's dominion over the mobile home. Nevertheless, the trial court suppressed the video of Richard Cain and Lisa Madson engaging in sexual bondage, electronic information found inside Cain's home, and evidence relating to marijuana distribution. The trial court found the order authorizing seizure of all videotapes to be overly broad and ruled that the warrant did not authorize confiscation of videos depicting sexual conduct between Madson and Cain. Richard Cain asserts that the trial court should have thereby invalidated the entire search warrant and suppressed photographs of his bondage accessories and documents of dominion. This assignment of error requires review of the severability doctrine.

Nothing in the language of the Fourth Amendment or article I, section 7 of the Washington State Constitution demands that the court suppress evidence gathered under a valid section of a search warrant when another section of the warrant permitted an unlawful search. Under the severability doctrine, when a warrant lists property supported by probable cause and detailed with particularity, and items not supported by probable cause or described with particularity, and the court can meaningfully separate the two by some logical and reasonable basis, the court may sever the two warrant provisions. *State v. Perrone*, 119 Wn.2d at 546 (1992). Stated differently, infirmity of a part of a warrant requires the suppression of evidence seized pursuant to that part of the warrant, but does not necessarily require suppression of anything seized pursuant to the valid parts of the

20

warrant.  *State v. Perrone*, 119 Wn.2d at 556.

Severing the valid portion of a search warrant from the invalid portion of a warrant demands the presence of five elements: (1) the warrant must have lawfully authorized entry into the premises, (2) the warrant must have listed one or more particularly described items for which probable cause existed, (3) the part of the warrant that included particularly described items supported by probable cause must be significant when compared to the warrant as a whole, (4) the searching officers must have found and seized the disputed items while executing the valid part of the warrant, and (5) the officers must not have conducted a general search, meaning a search in which they flagrantly disregarded the warrant's scope.  *State v. Maddox*, 116 Wn. App. 796, 807-08, 67 P.3d 1135 (2003), *aff'd,* 152 Wn.2d 499, 98 P.3d 1199 (2004).  Richard Cain claims the warrant failed to meet the third, fourth, and fifth elements of the severability doctrine.  We disagree.

Richard Cain concedes that the June 2011 search warrant fulfilled elements one and two of the severability doctrine.  We agree.  The June 2011 search warrant lawfully allowed entry into Richard Cain's mobile home since officers would likely find evidence relevant to a crime therein.  The warrant particularly described bondage devices, property supported by probable cause.

Richard Cain asserts that the valid portions of the warrant supported by probable cause lack significance relative to the primary purpose of the warrant.  We conclude to

21

the contrary. The valid portions served the primary purpose behind the search warrant. The warrant authorized seizure of photographs of Richard Cain's mobile home, bondage instruments, photographs and moving pictures of child pornography, and documents of dominion. Law enforcement did not know if videos of child pornography existed, particularly between Erin and Cain, and so principally sought evidence of bondage. Lisa Madson and Erin informed law enforcement that Cain derived pleasure from restraining his sexual partner, and law enforcement needed to determine if Erin truthfully reported forced sex with Cain. Law enforcement primarily wanted confirming evidence of the description of bondage.

Richard Cain contends the affidavit of Detective Scott Runge established that the primary purpose of the search warrant was to obtain video evidence of Cain abusing Erin and evidence of a marijuana operation. In support of this contention, Cain cites the search warrant and a concluding section of Scott Runge's affidavit that stated he presumed that Cain recorded acts with Erin. Nevertheless, Runge did not declare that garnering videos constituted the primary purpose of a search of the Cain residence. Also, the search for evidence of marijuana came after officers searched for bondage instruments.

In support of his argument against unseverability, Richard Cain contends that the trial court suppressed most of the evidence seized during the search. We do not know how Cain quantifies the evidence for purposes of comparing the amount of evidence

suppressed compared to the amount of evidence not suppressed. We note that the trial

court quashed two categories of seized property, evidence of marijuana and child

pornography. The court denied suppression of three categories of property, photographs

of the mobile home, bondage devices, and documents of dominion. In that sense, the trial

court may have rejected most of Cain's contentions. Regardless, the law does not

demand that we count the property suppressed and the property properly seized and

compare the two. Determining the significant part of the warrant should not depend on

the number of words or paragraphs dedicated to listing the property that serves as the

primary reason for the search. *State v. Higgs*, 177 Wn. App. 414, 432, 311 P.3d 1266

(2013).

Next, Richard Cain claims that the officers executed the valid part of the warrant,

as determined by the trial court, while the officers executed the invalid portion by

searching for marijuana and electronic storage devices. We disagree. Searching for

bondage apparatuses played no role in searching for marijuana or electronics. The

officers did not even search for marijuana until they had completed the search for

bondage instruments.

Finally, Richard Cain argues that the trial court authorized an impermissible

general search of his mobile home. Once again we disagree. The broad nature of the

electronic storage device and marijuana portions of the warrant did not render the

particularity requirements of the warrant meaningless. Cain presents no evidence that

law enforcement indiscriminately rummaged through his mobile home seeking incriminating evidence. A warrant showing probable cause sought bondage devices and dominion evidence, and such items were found where one would expect inside Cain's abode.

Limiting Instruction

Richard Cain next assigns error to the trial court's refusal to provide the jury with his proposed limiting instruction. He claims that evidence of his corporal discipline of Erin and Uriah, possession of guns, and shooting of a bunny constituted character and propensity evidence under ER 404(b) such that the court should have delivered the limiting instruction. As part of his argument on appeal, Cain does not assert that ER 105 demanded delivery of an instruction.

Richard Cain's assignment of error raises numerous questions. First, did Cain preserve an assignment of error that evidence of earlier conduct in the presence of the children necessitated a limiting instruction? Second, does Cain's challenge entail ER 404(b) evidence? Third, assuming the State's evidence constituted ER 404(b) evidence, was Cain entitled to a limiting instruction? Fourth, if Cain was entitled to a limiting instruction, did he propose a correct instruction? Fifth, if Cain did not propose a correct instruction, must the trial court have refashioned a correct limiting instruction? Sixth, assuming the State's evidence did not constitute ER 404(b) evidence, was Cain still entitled to a limiting instruction? Seventh, may Cain argue on appeal that, even though

the State's evidence did not comprise ER 404(b) evidence, he was still entitled to a limiting instruction? Eighth, was any alleged error in refusing to deliver the jury instruction harmful error? Because of our answers to questions one, two, and seven, we do not address the other questions.

*Issue 4: Whether Richard Cain preserved as error his claim that the trial court should have delivered a limiting jury instruction?*

*Answer 4: Yes.*

Richard Cain does not assign error to the introduction of evidence concerning earlier conduct toward Erin and Uriah. Such evidence is relevant. A victim's fear is admissible to explain a delay in reporting a crime. *State v. Wilson*, 60 Wn. App. 887, 890, 808 P.2d 754 (1991).

Richard Cain assigns error to the trial court's refusal to give a proposed limiting instruction that would direct the jury to employ testimony about his earlier acts of discipline and possession and employment of guns only for the purpose of determining the credibility of the State's witnesses. The instruction characterized the conduct as "acts of physical and emotional abuse." CP at 385. The trial court refused to deliver the proposed instruction. During the trial time devoted to instructional exceptions, Cain failed to object to the court's refusal to deliver the instruction. As a result, the State contends that Cain may have waived the right to assign error on appeal. Because Cain

provided a proposed instruction and earlier advocated the use of the instruction while explaining his reasons for the instruction, we disagree.

CrR 6.15(c) addresses exceptions to jury instructions and reads, in part:

> **Objection to Instructions.** Before instructing the jury, the court shall supply counsel with copies of the proposed numbered instructions, verdict and special finding forms. The court shall afford to counsel an opportunity in the absence of the jury to object to the giving of any instructions and the refusal to give a requested instruction or submission of a verdict or special finding form. The party objecting shall state the reasons for the objection, specifying the number, paragraph, and particular part of the instruction to be given or refused. . . .

A principal purpose behind the rule is to provide notice to the trial court of objections to the giving of the jury instructions or the refusal to give any jury instructions so that the trial court could consider the objections and correct any error before an appeal.

The State cites *State v. Sublett*, 156 Wn. App. 160, 190, 231 P.3d 231 (2010), *aff'd,* 176 Wn.2d 58, 292 P.3d 715 (2012), for the proposition that a party waives an assignment of error on appeal if he does not object to the refusal to give a proposed instruction as CrR 6.15(c) demands. The State correctly cites *Sublett* for this proposition, but in *Sublett* the defendant failed to propose any instruction and advocated for the instruction for the first time on appeal.

Richard Cain delivered a proposed jury instruction to the court and to the State. During an earlier jury instruction conference on the record, Cain asked for the delivery of the instruction and espoused reasons for the instruction. As noted by the trial court after

the reading of the jury instructions to the jury, the trial court knew of Cain's request and

the reason for the request, but ruled against delivering the instruction. At that time, Cain

renewed his objection to the failure to give the instruction. The State did not then argue

that Cain had waived his objection. The State asserts no prejudice on appeal by reason of

Cain's failure to object to the refusal to give the jury instruction during the final

instructional conference.

CrR 1.2 introduces the criminal rules for superior court and declares:

> These rules are intended to provide for the just determination of
> every criminal proceeding. They shall be construed to secure simplicity in
> procedure, fairness in administration, effective justice, and the elimination
> of unjustifiable expense and delay.

RAP 1.2(a) reads:

> **Interpretation.** These rules will be liberally interpreted to promote
> justice and facilitate the decision of cases on the merits. Cases and issues
> will not be determined on the basis of compliance or noncompliance with
> these rules except in compelling circumstances where justice demands,
> subject to the restrictions in rule 18.8(b).

Because Richard Cain fulfilled the purpose behind CrR 6.15(c) and the State does not

identify prejudice, we conclude he preserved for appeal any error.

*Issue 5: Whether the State presented ER 404(b) evidence?*

*Answer 5: No.*

Richard Cain contends that the trial court erred in refusing to provide his

limiting instruction regarding prior acts and thereby violated Cain's right to a fair

trial by permitting the jury to consider such evidence for propensity purposes. In

so arguing, Cain cites ER 403 and 404(b) as support. He frames his assignment

of error as:

> "ASSIGNMENT OF ERROR 1: The trial court erred in refusing to provide the jury with a limiting instruction after permitting character and propensity evidence pursuant to ER 404(b) and ER 403, particularly where the defense requested such an instruction."

Br. of Appellant at 2. Cain cites *State v. Goebel*, 36 Wn.2d 367, 379, 218 P.2d

300 (1950), for the proposition that, when the State presents "ER 404(b)

information," Washington law demands that the court declare to the jury the

purpose or purposes under which the evidence is admissible and inform the jury

that it may consider the evidence only for such purpose or purposes. This

assignment of error and argument on appeal coincides with the position taken by

Richard Cain at trial that ER 404(b) evidence demands a limiting instruction.

A predicate to Richard Cain's assignment of error is the State's presentation of ER

404(b) evidence, which rule addresses evidence for the purpose of proving that, when

committing the alleged crimes, Cain acted in conformity to his character or propensities.

Thus, we must identify the evidence that Cain targets as propensity evidence and

determine if the State used the evidence to argue or establish that Cain acted in

conformance with that evidence when committing his crime. In his appeal brief, Cain

references his prior actions that discouraged Erin from reporting his alleged sexual abuse

because of her fear of him. Cain then lists evidence of his corporal discipline of Erin and

Uriah, his directions to the children to pick up rocks in a certain manner, his yelling, his

threats to Erin not to disclose his conduct, his ownership and display of firearms, and his

shooting of a juvenile rabbit.

The relevant section of ER 404(a) and its counterpart ER 404(b) reads:

> (a) **Character Evidence Generally.** Evidence of a person's
> character or a trait of character is not admissible for the purpose of proving
> action in conformity therewith on a particular occasion, except:
>     . . . .
> (b) **Other Crimes, Wrongs, or Acts.** Evidence of other crimes,
> wrongs, or acts is not admissible to prove the character of a person in order
> to show action in conformity therewith. It may, however, be admissible for
> other purposes, such as proof of motive, opportunity, intent, preparation,
> plan, knowledge, identity, or absence of mistake or accident.

Note that ER 404(b) precludes the admissibility of other acts to show a party acted in

conformity therewith. ER 404 confusingly amalgamates varying concepts and states two

of its rules negatively and one of its rules positively. The rule might better read, at least

in a criminal trial context:

> Character and Earlier Conduct. The State may introduce evidence of
> a defendant's earlier actions to show propensity to commit the alleged
> criminal act only when motive, opportunity, intent, preparation, planning,
> knowledge, identity, absence of mistake, or absence of accident is at issue.
> Otherwise, the State may not introduce evidence of a defendant's earlier
> conduct or of the defendant's character to show a propensity to commit the
> alleged criminal act or to show he acted in conformance with a character
> trait.

Generally, ER 404(b) prohibits "[e]vidence of other crimes, wrongs, or acts" in

order to demonstrate a defendant's propensity to commit the charged crime. ER 404(b); *See State v. Holmes*, 43 Wn. App. 397, 400, 717 P.2d 766 (1986). Evidence submitted under ER 404(b) must be viewed in tandem with ER 403 to ensure the probative value is not substantially outweighed by its prejudicial effect. *State v. Cook*, 131 Wn. App. 845, 850, 129 P.3d 834 (2006). If the trial court admits ER 404(b) evidence, the court must provide the jury with a limiting instruction specifying the purpose of the evidence. *State v. Foxhoven*, 161 Wn.2d 168, 175, 163 P.3d 786 (2007); *State v. McCreven*, 170 Wn. App. 444, 458, 284 P.3d 793 (2012). This duty to deliver a limiting instruction activates only if the accused requests an instruction. *State v. Russell*, 171 Wn.2d 118, 123, 249 P.3d 604 (2011).

The State argues that Richard Cain mischaracterizes the subject testimony as ER 404(b) evidence, when the testimony is ER 402 evidence. We know of no decision that refers to any evidence as "ER 402 evidence." ER 402 admits any relevant evidence. In this sense, all evidence constitutes ER 402 evidence. We assume that the State merely seeks to argue that the prior harsh conduct of Richard Cain is germane to one of the issues in the trial and that ER 404 has no bearing as to how to handle such evidence.

According to the State, the subject evidence was relevant to explain Erin's late reporting of the sexual abuse. The State did not submit the evidence to show that Cain acted in conformity with his past harsh conduct when sexually molesting Erin. The State did not admit the evidence for the unadorned purpose of proving Cain to be a bad person.

ER 404(b) prohibits a court from admitting "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." This prohibition encompasses not only prior bad acts and unpopular behavior, but any evidence offered to "show the character of a person to prove the person acted in conformity" with that character at the time of a crime. *State v. Everybodytalksabout*, 145 Wn.2d 456, 466, 39 P.3d 294 (2002). We agree with Richard Cain that the subject testimony places him in a bad light, but agree with the State that ER 404 lacks germaneness to Cain's assignment of error.

The State did not charge Cain with any crime involving threats or fear. The State of Washington did not introduce the evidence to show that Richard Cain acted in conformity with this harsh behavior when sexually molesting Erin. The purpose of the evidence was to explain why Erin did not earlier report the crimes. We have reviewed the State's summation and re-reviewed the section of the closing argument about which Cain complains. The State never argued to the jury that the reported harsh discipline meant that Cain more likely than not committed the charged crimes. Therefore, we rule that the trial court committed no error when refusing to deliver a limiting instruction pursuant to the dictates of ER 404(b).

*Issue 6: Assuming the State's evidence did not constitute ER 404(b) evidence, was Cain still entitled to a limiting instruction?*

*Answer 6: No. Richard Cain never presented to the trial court any argument that a limiting instruction should be afforded for another reason.*

We wonder if the trial court should deliver a limiting instruction when the State offers evidence of previous bad behavior of the accused in order to explain the late reporting of a crime rather than to show conformity to the behavior when committing the crime. ER 105 declares:

> When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.

When evidence is proper for one purpose but inadmissible for another purpose, a limiting instruction is usually required. *In re Detention of West*, 171 Wn.2d 383, 398, 256 P.3d 302 (2011). Upon a party's request, ER 105 requires the court to restrict the evidence to its proper scope and instruct the jury accordingly. *In re Detention of Mines*, 165 Wn. App. 112, 129, 266 P.3d 242 (2011).

On appeal, Richard Cain does not cite ER 105, nor did Cain cite the evidentiary rule before the trial court. For this reason, we must decide to address whether the trial court should have given a limiting instruction in accordance with ER 105 and whether we should on our own raise the issue of whether the court should have otherwise given a limiting instruction.

Generally, issues not raised in the trial court may not be raised for the first time on appeal. RAP 2.5(a); *State v. Nitsch*, 100 Wn. App. 512, 519, 997 P.2d 1000 (2000). RAP 2.5(a) formalizes a fundamental principle of appellate review. The first sentence of the rule reads:

> **Errors Raised for First Time on Review.** The appellate court may refuse to review any claim of error which was not raised in the trial court.

Good sense lies behind the requirement that arguments be first asserted at trial. The prerequisite affords the trial court an opportunity to rule correctly on a matter before it can be presented on appeal. *State v. Strine*, 176 Wn.2d 742, 749, 293 P.3d 1177 (2013). There is great potential for abuse when a party does not raise an issue below because a party so situated could simply lie back, not allowing the trial court to avoid the potential prejudice, gamble on the verdict, and then seek a new trial on appeal. *State v. Weber*, 159 Wn.2d 252, 271-72, 149 P.3d 646 (2006); *State v. Emery*, 174 Wn.2d 741, 762, 278 P.3d 653 (2012). The theory of preservation by timely objection also addresses several other concerns. The rule serves the goal of judicial economy by enabling trial courts to correct mistakes and thereby obviate the needless expense of appellate review and further trials, facilitates appellate review by ensuring that a complete record of the issues will be available, and prevents adversarial unfairness by ensuring that the prevailing party is not deprived of victory by claimed errors that he had no opportunity to

address. *State v. Strine*, 176 Wn.2d at 749-50; *State v. Scott*, 110 Wn.2d 682, 687-88, 757 P.2d 492 (1988).

Countervailing policies support allowing an argument to be raised for the first time on appeal. For this reason, RAP 2.5(a) contains a number of exceptions. RAP 2.5(a)(3) allows an appellant to raise for the first time "manifest error affecting a constitutional right." During oral argument, Richard Cain suggested that outside of ER 404(b) simple due process may have demanded a limiting instruction. Nevertheless, Cain cited no decision that grounds the need for a limiting instruction on due process or any other constitutional provision. He does not claim manifest constitutional error.

Richard Cain might assert that his assignment of error for the failure to give a limiting instruction should be deemed sufficient for this court to review his assigned error under ER 105. We disagree. The trial court should first be given the opportunity to address a nonconstitutional error. If Cain had mentioned ER 105 to the trial court, the trial court could have assessed the need for a limiting instruction under the rule.

A party must inform the court of the "rules of law" it wishes the court to apply and afford the trial court an opportunity to correct any error. *Smith v. Shannon*, 100 Wn.2d 26, 37, 666 P.2d 351 (1983). We may decline to consider an issue that was inadequately argued below. *International Association of Fire Fighters, Local 46 v. City of Everett*, 146 Wn.2d 29, 37, 42 P.3d 1265 (2002); *Mid Mountain Contractors, Inc. v. Department of Labor & Industries*, 136 Wn. App. 1, 8, 146 P.3d 1212 (2006). We need not consider

on appeal a theory that the lower court had no effective opportunity to consider. *Bellevue*

*School District No. 405 v. Lee*, 70 Wn.2d 947, 950, 425 P.2d 902 (1967); *Commercial*

*Credit Corp. v. Wollgast*, 11 Wn. App. 117, 126, 521 P.2d 1191 (1974).

At least two foreign courts have ruled that it will not entertain an argument based

on a statute, when the appellant did not cite the statute to the trial court. *Araiza v.*

*Younkin*, 188 Cal. App. 4th 1120, 1126, 116 Cal. Rptr. 3d 315 (2010); *Old Republic*

*National Title Insurance Co. v. Realty Title Co.*, 1999 MT 69, 294 Mont. 6, 978 P.2d 956

(1999). In *Cole v. Town of Los Gatos*, 205 Cal. App. 4th 749, 764, 140 Cal. Rptr. 3d 722

(2012), the reviewing court refused to address an assignment of error when the appellant

failed to cite the relevant section of the evidence code when objecting to evidence.

*Statement of Additional Grounds for Review*

Richard Cain presents a statement of additional grounds for review, in which he

lists fourteen separate arguments. An offender may submit a pro se statement of

additional grounds for review "to identify and discuss those matters related to the

decision under review *that* the defendant believes have not been adequately addressed by

the brief filed by the defendant's counsel." RAP 10.10(a). The rule additionally provides

in part:

> Reference to the record and citation to authorities are not necessary
> or required, but the appellate court will not consider a defendant's
> statement of additional grounds for review if it does not inform the court of
> the nature and occurrence of alleged errors. Except as required in cases in
> which counsel files a motion to withdraw as set forth in rule 18.3(a)(2), the

appellate court is not obligated to search the record in support of claims made in a defendant's statement of additional grounds for review. . . .

RAP 10.10(c).

Richard Cain first contends that the trial court "engaged in no presentencing" after his third trial. The record does not include the transcript of a sentencing or presentencing hearing, but does include letters advocating for a lenient sentence and also a sentencing memorandum. The appellate court will not consider a defendant's statement of additional grounds for review if the statement fails to inform the court of the nature and occurrence of alleged errors. RAP 10.10(c); *State v. Bluehorse*, 159 Wn. App. 410, 436, 248 P.3d 537 (2011). We lack any coherent explanation of this alleged error.

Next, Richard Cain argues:

> (2) [m]y council [sic] never received the deposition of Kim Willis before her testimony; (3) Detective Magnuson was subpoenaed to appear and give testimony. He did not show up to testify. In my first trial he testified that he told Detective Runge (we can't go in there the warrant is invalid.) While looking at the warrant before entering my home . . . (5) [Erin] told on her mom and Aunt Nichole for more physical abuse over a tablet with several text messages beneficial to the defense; (6) The text messages were not allowed to be brought before the jury. I believe the text messages would have benefitted my side of the story, and had great impact on the jury . . . (8) Nichole and Lisa inspected [Erin's] vagina the evening these false allegations came out. This was never brought forward till [sic] the third trial. Nichole claimed it alarmed her because [Erin's] vagina did not look like her daughter's vagina so they thought something bad had happened.

Statement of Additional Grounds at 2-3. We do not respond to these alleged errors since Cain relies on facts not in the record. Issues that involve facts or evidence not in the

record are properly raised through a personal restraint petition, not a statement of additional grounds. *State v. Calvin*, 176 Wn. App. 1, 26, 316 P.3d 496 (2013), *review granted in part on other grounds,* 183 Wn.2d 1013, 353 P.3d 640 (2015).

Richard Cain further contends that Lisa Madson admitted he burned objects so that he need not look at the objects again; Madson admitted he burned the robes because the robes were used on Erin; Madson and Erin testified that Cain penetrated Erin despite Erin's vaginal area lacking damage; and the forensic interviewer was not allowed to testify. These three assignments of error require the court to evaluate and weigh evidence heard by the jury. An appellate court may not reweigh the evidence and come to a finding contrary to the jury. *Quinn v. Cherry Lane Auto Plaza*, *Inc.*, 153 Wn. App. 710, 717, 225 P.3d 266 (2009). Therefore, we do not address these contentions.

In his statement of additional grounds, Richard Cain adds: the trial court stated a belief that the search warrant was severable; the trial court admitted he had become as emotionally invested in the case as the prosecutor had; the trial court allowed the prosecutor to ask leading questions about Lisa Madson learning about CPS being called about a beating; the State relied heavily on photographic evidence that constituted fruit of the poisonous tree and that depicted objects never mentioned by Erin; the detectives took no legal photographs; and the trial court denied a motion to dismiss despite insufficient evidence to convict him.

No. 34417-7-III
*State v. Cain*

evidence to convict him.

We have already ruled the trial court to be correct when ruling that the search warrant was severable. Richard Cain cites no authority that the trial court's comment, assuming it occurred, of emotional investment creates error. He does not cite the record where the trial court purportedly made this comment. The State asked a leading question of Lisa Madson, but rephrased the question after an objection from defense counsel. We have already ruled that the photographs could be admitted as evidence because of the validity of that portion of the search warrant. The trial court did not err when denying the motion to dismiss. Sufficient evidence warranted a conviction on child molestation.

CONCLUSION

We affirm the conviction of Richard Cain for child molestation.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Fearing, C.J.

WE CONCUR:

Korsmo, J.

Siddoway, J.

38